# United States Court of Appeals
## For the First Circuit

No. 04-2328

MOHAMMAD ADNAN KHEIREDDINE;
HASSANE ADNAN KHEIREDDINE,

Petitioners,

v.

ALBERTO GONZALES, Attorney General of the United States,

Respondent.

ON PETITION FOR REVIEW OF AN ORDER
OF THE BOARD OF IMMIGRATION APPEALS

Before

Selya and Lynch, <u>Circuit Judges</u>, and
Restani,[*] <u>Judge</u>.

<u>Daniel F. Cashman</u>, <u>Susanna L. Shafer</u>, and <u>Cashman & Lovely,</u>
<u>P.C.</u> on brief for petitioners.
<u>Aixa Maldonado-Quiñones</u>, Assistant United States Attorney,
and <u>Thomas P. Colantuono</u>, United States Attorney, on brief for
respondent.

October 25, 2005

---

[*] Chief Judge of the United States Court of International
Trade, sitting by designation.

**LYNCH**, <u>**Circuit Judge**</u>.  This petition seeks review of the decision of the Board of Immigration Appeals (BIA) affirming the Immigration Judge's (IJ's) decision to deny applications for asylum by two Lebanese brothers ("petitioners").  While the petitioners attack the merits of the denial of asylum on the basis that the IJ made serious errors of law, the most significant claim asserted is that the BIA violated their due process rights by deciding their appeal when a portion of the transcript of the testimony of their expert witness was missing.

The IJ had found the petitioners' claims not to be credible and had noted their failure to provide corroboration for their claims.  Petitioners say the missing transcript is material because it contained the expert's opinion as to why they could not reasonably be expected to corroborate their testimony.

If petitioners were correct that they were denied due process by the transcription failure, we would likely not proceed to review the merits of the BIA decision, but would rather remand to the agency.  Because the problem of missing portions of transcripts is a recurring one, we set the parameters here for evaluation of such claims.

## I.

The evidence at the removal hearing consisted of the testimony of petitioner Hassane Adnan Kheireddine, a brief statement by his brother, petitioner Mohammad Adnan Kheireddine,

that he agreed with Hassane's testimony and did not wish to correct it, and the testimony of their expert witness, Professor Dirk Vandewalle of Dartmouth College. The documentary evidence consisted of the applications for asylum, an affidavit by Professor Vanderwalle, and a State Department Country Conditions Report on Lebanon. All of this testimony was recorded and transcribed, save for a portion of the direct and the entire cross-examination of the expert, as well as the closing arguments of both sides. The BIA had before it the incomplete transcript and the remainder of the administrative record.

As to the petitioners' testimony, we give a brief précis. The two brothers entered this country illegally from Mexico on June 30, 2001, and flew to Boston, where they lived until they were apprehended by the INS. They conceded removability but sought asylum, withholding of removal, and relief under the UN Convention Against Torture. They contended that they were former soldiers in the South Lebanon Army (SLA)[1] and, as a result, suffered past persecution at the hands of the Lebanese government and Hezbollah.[2] They claimed that when the Israeli Army withdrew from South Lebanon in 2000, Hezbollah kidnapped them and held them for a week, during

---

[1] The SLA was allegedly created by Israel to serve as a proxy for the Israeli Army during its occupation of southern Lebanon.

[2] There are a number of acceptable spellings of the name of the group, including "Hizballah," "Hizbollah" and "Hezballah." We use the most common English transliteration.

-3-

which they were interrogated about their service with the SLA. When Hezbollah turned them over to the Lebanese Army, the brothers went from the frying pan into the fire. The Lebanese Army mistreated them badly, beating and torturing them, and interrogating them about the SLA and its relationship with the Israeli Army. However, when asked whether either he or his brother had needed medical care after any of the incidents of torture and mistreatment, Hassane replied, "Of course, not. That was nothing."

After a month in Lebanese Army custody, petitioners were tried, convicted, and sentenced to six months in jail for certain crimes. The grounds for their conviction in Lebanon are somewhat unclear. Hassane testified that he and his brother were charged with either treason, for their alleged support of Israel through his membership in the SLA, or failure to comply with the Lebanese Army draft laws, or both.

In any case, Hassane testified that Hezbollah felt that the brothers "got off easy" with their six-month sentences given their participation in the SLA. After petitioners were released from jail in January 2001, masked gunmen arrived at their home and manhandled them and other family members. The men kidnapped the petitioners, took them away, and threatened to kill them. Petitioners were beaten before being released. After their release, they returned to work at their father's hardware store.

Their father, upset by the incidents just described, arranged for the brothers to leave the country.

The testimony recounted that one week after the brothers fled Lebanon, the remaining family members were interrogated as to the whereabouts of the brothers and threatened that the brothers would be harmed if they were found. When, at the hearing, petitioners' counsel was asked whether this event were referred to in the asylum applications, counsel replied, "I don't think it is, Judge." The asylum applications do both state: "[Hezbollah] have already threatened our father to kill us if we should return." Counsel for the government suggested that this "minor statement" might be construed to be a reference to the interrogation of the family after the brothers fled. The IJ acknowledged that explanation, but rejected it, finding that these events were in fact not mentioned in the applications.

When the IJ asked Hassane why he had not corroborated his testimony (for example, with a letter from his father, who remained, living as normal, in Lebanon) Hassane replied that he did not think he needed it. Hassane had been represented by counsel for over a year. When the IJ inquired of counsel as to the failure to introduce corroborative evidence, counsel replied he was not sure anything was available, and that there might be authentication difficulties. The IJ knew the counsel from an earlier case and

recalled that he had been generous in allowing the attorney to submit corroborative evidence in that case.

The IJ found the petitioners had not met their burden as to any of their claims because they were not credible.[3] The IJ noted that they had made no effort to buttress their credibility with corroborative evidence. The BIA affirmed and also rejected the petitioners' due process claim based on the missing transcript.

## II.

This is the second occasion for this court to deal with a claim arising out of a failure to transcribe a portion of a proceeding before an IJ. See Ibe v. Gonzales, 415 F.3d 142 (1st Cir. 2005) (finding no denial of due process where the IJ inadvertently failed to record the testimony of two witnesses). Our review of petitioners' due process claim is de novo. See id. at 144 (citing Aguilar-Solis v. INS, 168 F.3d 565, 568 (1st Cir. 1999)).

At least in the context of criminal prosecutions, due process requires a record of the trial proceeding in order to allow meaningful and effective appellate review. See Entsminger v. Iowa, 386 U.S. 748, 752 (1967); Specht v. Patterson, 386 U.S. 605, 610 (1967); United States v. Cashwell, 950 F.2d 699, 703 (11th Cir.

---

[3] The IJ also expressed doubt as to whether petitioners' mistreatment was truly "on account of" their membership in one of the protected classes, although it is not clear whether he rested his decision on that alternative ground as well.

-6-

1992). While this case involves the failure of transcription in an immigration proceeding, the respondent does not deny that the due process principle is the same: due process demands a "reasonably accurate, reasonably complete transcript," or an adequate substitute, to allow for meaningful and adequate appellate review. Ortiz-Salas v. INS, 992 F.2d 105, 106 (7th Cir. 1993); see also Marincas v. Lewis, 92 F.3d 195, 203-04 (3d Cir. 1996) (holding that "two of the most basic of due process protections" are "a hearing before a neutral immigration judge" and a "complete record of the proceedings").[4]  Absence of such a record of proceedings below hampers the ability of an alien to mount a challenge to the proceedings that were conducted before the IJ.  In addition, the lack of such a transcript may foreclose "effective administrative and judicial review."  Marincas, 92 F.3d at 203.  In McNary v. Haitian Refugee Center, Inc., 498 U.S. 479 (1991), for instance, the Court considered the INS's administration of the "special agricultural worker" amnesty program.  It found that "because of the lack of recordings or transcripts of . . . interviews and the

---

[4] We acknowledge that generally the due process requirements for immigration proceedings are lower than those for criminal proceedings. See Carlson v. Landon, 342 U.S. 524, 537 (1952); V. Capitaine, Life in Prison Without A Trial: The Indefinite Detention of Immigrants in the United States, 79 Tex. L. Rev. 769, 788 (2001). However, this does not mean that an alien in removal proceedings has no due process rights. See Reno v. Flores, 507 U.S. 292, 306 (1993) ("It is well established that the Fifth Amendment entitles aliens to due process of law in deportation proceedings."); Ishak v. Gonzales, 422 F.3d 22, 32 (1st Cir. 2005) (same).

inadequate opportunity for [special agricultural worker] applicants to call witnesses or present other evidence on their behalf, the administrative appeals unit of the INS . . . and the courts of appeals . . . have no complete or meaningful basis upon which to review application determinations." Id. at 496.

The Immigration and Nationality Act (INA) provides that in removal proceedings "a complete record shall be kept of all testimony and evidence produced at the proceeding." 8 U.S.C. § 1229a(b)(4)(C). For removal proceedings, the agency's own regulations provide: "The hearing shall be recorded verbatim except for statements made off the record with the permission of the immigration judge." 8 C.F.R. § 1240.9. Neither the INA nor the regulation speak of transcripts, but in practice, the BIA has generally required transcription of testimony. See Ortiz-Salas, 992 F.2d at 106. The agency, however, appears to have minimal formal procedures for correcting or supplementing inaccurate or incomplete transcripts. See 8 C.F.R. § 1003.1(e)(2) (providing that "a single [BIA] member may adjudicate . . . a case where remand is required because of a defective or missing transcript").

In contrast, the Federal Rules of Appellate Procedure supply a detailed provision on how missing or incomplete transcripts are to be handled:

> If the transcript of a hearing or trial is unavailable, the appellant may prepare a statement of the evidence or proceedings from the best available means, including the appellant's recollection. The statement must be served

-8-

> on the appellee, who may serve objections or proposed amendments within 10 days after being served. The statement and any objections or proposed amendments must then be submitted to the district court for settlement and approval. As settled and approved, the statement must be included by the district clerk in the record on appeal.

Fed. R. App. P. 10(c). The Federal Rules also provide a process for correction or modification of the record, should disputes about the accuracy or completeness of its contents arise. See Fed. R. App. P. 10(e).[5] The Federal Rules of Appellate Procedure, of course, do not apply to proceedings before the BIA.

The problem of inaccurate or incomplete transcription of immigration proceedings is not recent. See, e.g., McLeod v. INS, 802 F.2d 89, 94-95 (3d Cir. 1986); Sotto v. U.S. INS, 748 F.2d 832, 837-38 (3d Cir. 1984). Such persistent problems put at risk the ability of the courts of appeals to provide meaningful and effective appellate review. As the court in McLeod noted, "[t]ranscript deficiencies reflect adversely upon the integrity of the administrative process, and upon the possibility of meaningful review during the critical appellate stage." 802 F.2d at 95. An appropriate and detailed procedure for handling transcription

_____

[5] A great number of states have adopted analogous provisions for handling missing or inaccurate transcripts. See, e.g., Ala. R. App. P. 10(d), (f)-(g); Ariz. R. Civ. App. P. 11(c), (e); Cal. R. Ct. 124(e), 127; Col. App. R. 10(c), (e); D.C. App. R. 10(c); Fla. R. App. P. 9.200(b)(4), (f); Ind. R. App. P. 31; Mass. R. App. P. 8(c), (e); Minn. R. Civ. App. P. 110.03; Mont. R. App. P. 9(d), (f); Nev. R. App. P. 9(d); Ohio R. App. P. 9(C), (E); R.I. Sup. Ct. R. App. P. 10(d), (f).

problems before a case reaches the appellate review stage might ensure that aliens' due process rights remain intact. See Britt v. North Carolina, 404 U.S. 226, 227 (1971); Mayer v. City of Chicago, 404 U.S. 189, 194 (1971); Ibe, 415 F.3d at 144.

There is no question that in this case the agency failed to meet its "duty to prepare a reasonably accurate, reasonably complete transcript." Ortiz-Salas, 992 F.2d at 106. But a mere failure of transcription, by itself, does not rise to a due process violation. Our analogous cases from criminal law hold that a missing transcript, without more, does not require either reversal or remand. See United States v. Brand, 80 F.3d 560, 563 (1st Cir. 1996) (discussing the effect of a violation of the Court Reporter Act, 28 U.S.C. § 753(b)(1), which requires that all open court proceedings in criminal cases "be recorded verbatim"). Rather, the claimant must show "specific prejudice to his ability to perfect an appeal" sufficient to rise to the level of a due process violation. United States v. Smith, 292 F.3d 90, 97 & n.6 (1st Cir. 2002) (quoting Brand, 80 F.3d at 563) (internal quotation mark omitted); cf. United States v. Flecha-Maldonado, 373 F.3d 170, 178 (1st Cir. 2004).

Prejudice is an amorphous concept, and necessarily so, given the wide variety of facts that may arise. However, a few basic principles may be set forth. A petitioner in an immigration case cannot show prejudice if the missing portion of the transcript

is not material to the issue on review.  See McLeod 802 F.2d at 95-96 ; cf. Draper v. Washington, 372 U.S. 487, 495 (1963) (holding that a criminal defendant must be given only so much of the trial transcript as may pertain to the particular issues on appeal).  Nor may a petitioner meet his burden of showing prejudice if the missing material can be reasonably recreated or derived from other sources, and the petitioner has made no effort to obtain such a substitute record.  Cf. Ibe, 415 F.3d at 144; Equan v. U.S. INS, 844 F.2d 276, 278-79 (5th Cir. 1988); Bundy v. Wilson, 815 F.2d 125, 135 (1st Cir. 1987) ("A defendant's right to a transcript can be satisfied by providing him with a written substitute that reports the portions of the trial which underlie his appellate contentions." (citing Draper, 372 U.S. at 495)).  And prejudice to warrant a remand cannot be shown if the transcription failure does not make any difference to the outcome of the review.  See Ibe, 415 F.3d at 144; Singh v. Ashcroft, 367 F.3d 1139, 1143-44 (9th Cir. 2004).

Other factors that might be considered in a review for prejudice include: whether the missing testimony was duplicative of other properly recorded evidence; whether the witness was called by the alien or the government; whether the missing testimony was on direct or cross-examination; the directness of the connection between the missing testimony and the grounds of the IJ's decision; the nature and weight of the testimony which is transcribed; and

the resulting restrictions from the untranscribed testimony on the alien's ability to present his case on appeal for meaningful appellate review. This list is non-exhaustive; case-by-case analysis will often be required.

In Ibe, for example, the IJ had failed to record the testimony of two witnesses, but instead -- with the assistance of both Ibe's and the government's counsel -- created a record of their testimony using her notes and the witnesses' written statements. 415 F.3d at 143-44. Ibe made no objection to this procedure and offered nothing to suggest that this recreated record was inaccurate; thus the recreated record was adequate to provide meaningful appellate review. Id. at 144. We, like the BIA, found that Ibe could not meet his burden of showing prejudice given that Ibe's counsel admitted that the content of the missing testimony would provide nothing more than what was provided in the affidavits, which were not missing from the record. Id.

In this case, the transcript failed to record a portion of the direct testimony and the entire cross-examination of Professor Vandewalle, the petitioners' expert witness, although the transcript does contain ten pages of his direct testimony. Petitioners suggest that the missing transcript pages would have helped demonstrate why they were unable to obtain corroborative

evidence.[6] In particular, they argue that "comments made by the [IJ] in his decision indicate that the expert witness did testify regarding the availability of documents from Lebanon" and so the IJ's reliance on the lack of corroborative evidence was improper. In fact, the only reference made by the IJ to untranscribed testimony does not advance their case. The IJ noted that the petitioners, after coming to the United States, voluntarily presented themselves to the Lebanese consulate in New York to ask for new Lebanese passports with their correct names, and the passports were issued without any difficulty. The IJ commented that the expert had remarked in his testimony that it was "truly puzzling" that the petitioners obtained a second set of Lebanese passports while in the United States. As the IJ correctly concluded, this testimony by petitioners' own expert about obtaining second passports undercuts their claim of persecution. The petitioners, who were present at the hearing, have never asserted that the IJ's recounting of that statement by the expert was in error.

Gaps in the missing testimony can be filled, at least in part, by the expert's affidavit, which was placed in the record and

_____

[6] The brothers raise this precise argument for the first time before us. Before the BIA they simply argued that since the IJ relied on statements made by the expert after transcription failed, their ability to challenge the IJ's interpretation of the testimony was impeded, but they did not explain why. For argument's sake, we ignore what may well have been a waiver of the argument.

was before the BIA and this court to review. In the affidavit, the expert accepted the petitioners' story as credible based on their declarations. While it does not explicitly discuss the topic of the petitioners' failure to produce corroborating information, the affidavit does paint a picture of Lebanon as "a kind of selective anarchy" and stresses the "lawlessness of the territory in which they live." Presumably Professor Vandewalle's testimony before the IJ was consistent with the information he provided in his affidavit: that the failure to obtain documents was explained by lawlessness in Lebanon. The IJ heard that explanation and implicitly rejected it. Thus, as to this reason at least, there was no material omission. Furthermore, while this might be an explanation for the failure to corroborate with government documents, it certainly does not explain the failure to obtain affidavits from family members regarding essential details of the petitioners' story.

Based on our review of the entire record, we conclude that petitioners have not established the transcription failure created "specific prejudice to [their] ability to perfect an appeal" sufficient to justify reversal of or remand to the agency. Smith, 292 F.3d at 97 (internal quotation marks and citation omitted). The petitioners have the burden to explain to us why the missing portion of the transcript is material to their claim here, and beyond vague references to testimony that seems to cut against

-14-

their position, they have failed to do so. In addition, the brothers were present at the hearing, and there is no reason to think that Professor Vandewalle was not still available to reconstruct his testimony.

Furthermore, even if somehow the missing transcript gave a reason for the utter failure to produce corroboration, there is no suggestion that the outcome would have been any different had the BIA had the full transcript before it. The IJ rested his decision on an adverse credibility determination, bluntly concluding "I don't believe them." The IJ had ample reason to question the petitioners' credibility based on their own testimony.

The IJ noted that there were material inconsistencies between the brothers' testimony and their applications for asylum. For example, the brothers' asylum applications did not contain the testimony given by Hassane that forces came by looking for them and terrorized the family after the brothers had left Lebanon. Also, the IJ found that "notwithstanding the claims of horrific mistreatment," the petitioners never claimed to need "any kind of medical care." The IJ found that if the petitioners truly had undergone significant mistreatment, "one would have to question why neither of them sought any kind of medical assistance." Further, the IJ noted that although petitioners claimed that they would be subject to persecution if they returned to Lebanon, they also explained that the Lebanese government considered them to have paid

their dues; that is, that "the government was no longer interested in them." Petitioners make no claim that anything in the expert's report or testimony resolved those inconsistencies.

### III.

Having rejected the due process claim, the merits of the petition may be easily dealt with. Under the deferential "substantial evidence" standard of review, we uphold the IJ's credibility determination "unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B); see also Rodriguez-Ramirez v. Ashcroft, 398 F.3d 120, 123 (1st Cir. 2005). The petitioners argue that the IJ erred in application of Matter of S-M-J-, 21 I. & N. Dec. 722 (BIA 1997), which set forth the standard for when corroborating evidence was required to support an applicant's claim. In that case, the BIA held that "[w]here the record contains general country condition information, and an applicant's claim relies primarily on personal experiences not reasonably subject to verification, corroborating documentary evidence of the asylum applicant's particular experience is not required." Id. at 725 (emphasis added). Petitioners argue that in this case the request for corroborating evidence was not reasonable.

The petitioners' claim misfires. The IJ did not require corroborating evidence; he noted that corroborating evidence could only help the petitioners, that some corroborating evidence was

likely available, and that petitioners had failed to produce any. Nothing in <u>Matter of S-M-J-</u> precluded the IJ from deeming already not credible petitioners even less credible when they failed to back up their claims with information reasonably available. <u>See Matter of Y-B-</u>, 21 I. & N. Dec. 1136, 1139 (BIA 1998) ("[T]he weaker an alien's testimony, the greater the need for corroborative evidence.").

There is no need to address the remaining issues raised by the petitioners; their case disappears with the rejection of the due process argument and the conclusion that the adverse credibility determination was amply supported by the record.

The decision of the BIA is **<u>affirmed</u>**; the petition for review is **<u>denied</u>**.