# United States Court of Appeals
## For the First Circuit

No. 07-1390

SARETH YOSD,

Petitioner,

v.

MICHAEL B. MUKASEY,[*]
Attorney General,

Respondent.

ON PETITION FOR REVIEW OF AN ORDER OF

THE BOARD OF IMMIGRATION APPEALS

Before

Torruella, Lipez, and Howard,
Circuit Judges.

Joseph A. MacDonald on brief for petitioner.
Peter D. Keisler, Assistant Attorney General, David V. Bernal, Assistant Director, Office of Immigration Litigation, and Lauren E. Fascett, Trial Attorney, Office of Immigration Litigation, on brief for respondent.

January 29, 2008

---

[*]Pursuant to Fed. R. App. P. 43(c)(2), Attorney General Michael B. Mukasey has been substituted for former Attorney General Alberto R. Gonzáles as the respondent herein.

**LIPEZ**, **Circuit Judge**. Sareth Yosd, a Cambodian national, seeks review of a final order of the Board of Immigration Appeals ("BIA") denying his claims for asylum relief, withholding of removal, under sections 208 and 241(b)(3) of the Immigration and Nationality Act, 8 U.S.C. §§ 1158, 1231(b)(3), and protection pursuant to the U.N. Convention Against Torture ("CAT"). Following the BIA's determination that his first hearing had been marred by inadequate translation services, the BIA remanded the case for a second hearing before the same immigration judge ("IJ") who had previously ruled that Yosd was not credible. Yosd contends that this remand violated his due process rights because the IJ was predictably predisposed to rule against him during the second hearing in order to defend her earlier decision. We find no due process violation and conclude that the IJ's adverse credibility determination is supported by substantial evidence. Accordingly, we affirm.

## I.

Yosd entered the United States on May 25, 2001, using a non-immigrant visa that permitted him to remain here until August 24, 2001. In January 2002, Yosd filed an application requesting asylum relief, withholding of removal, and protection pursuant to the CAT. Yosd's asylum application was premised on his active membership in political parties opposed to the ruling Cambodian People's Party (CPP). He asserted that because of his political

activism in opposition to Hun Sen, the CPP leader, he had been forced to go into hiding in 1997 and again in 2000. He also recounted being arrested, jailed for two days, and beaten by police in September 1998 for bringing bread and water to protesters outside the National Assembly building.

After an initial interview concerning his asylum application, Yosd was referred to the Boston Immigration Court and charged with removability pursuant to 8 U.S.C. § 1227(a)(1)(B) for having overstayed his visa. An IJ heard testimony from Yosd on September 13, 2002 and March 12, 2003,[1] and subsequently denied his requests for relief and ordered him removed from the United States.

The IJ's ruling was based on a finding that Yosd's testimony was not credible. In particular, the IJ noted that Yosd had been inconsistent regarding where he was living between November 2000 and his departure for the United States in May 2001. In the affidavit attached to his asylum application, Yosd claimed that he had gone into hiding in "the countryside and jungle" in November 2000 and had remained in hiding until his departure from Cambodia. However, he later testified that he returned home in January 2001 to celebrate the New Year with his family and remained

---

[1]The IJ granted Yosd a continuance at the end of the September 2002 hearing to permit him to submit additional documentary evidence in support of his claims, and resumed hearing testimony in March 2003. The same interpreter translated both hearings. For convenience, we refer to the September 2002 and March 2003 hearings collectively as the "first hearing."

"in hiding" at his home until May 2001. But Yosd also testified that during the period just prior to his departure from Cambodia while he purported to be in hiding, he requested a passport in person from Cambodian government officials, traveled to the U.S. Embassy to obtain a visa, and was permitted to leave the country without incident. The IJ also noted that Yosd had testified in September 2002 that he had destroyed his Sam Rainsy Party[2] membership card prior to leaving Cambodia, but in March 2003 he introduced just such a membership card into evidence at his hearing.

The IJ also found his testimony inconsistent concerning where his wife and children had lived and the status of his sewing machine business following his departure from Cambodia. He testified in September 2002 that he had closed his business two days before he left the country and that his family had moved to a village some 30 kilometers from Phnom Penh. He then testified in March 2003 that his wife and children had lived in the family home in Phnom Penh following Yosd's departure and that his spouse had continued to run Yosd's sewing machine shop until some time in 2002. Given these inconsistencies, the IJ concluded that Yosd's

---

[2]The Sam Rainsy Party is one of two opposition parties in which Yosd asserted he had been an active member. He testified that he had joined the FUNCINPEC Party in 1992, but that he became disillusioned with Prince Ranariddth's leadership of that party in 1998, prompting him to join the Sam Rainsy Party.

testimony as to his "true motivations in leaving Cambodia cannot be given any weight."

Yosd appealed the IJ's decision to the BIA, challenging the quality of the translation services he had received during the first hearing. The BIA found that there was a "significant probability" that "the interpretation of [Yosd's] testimony was inadequate." The BIA found "a likelihood that the respondent was unable to meaningfully participate in the removal proceedings" because of poor translation services, and remanded the case to the same IJ for "further proceedings consistent with this opinion and for the entry of a new decision."

Following the remand, the IJ held another hearing on March 9, 2005.[3] The IJ had requested that the Language Services Unit evaluate the interpreter who had translated the first hearing, and she began the second hearing by submitting that report into evidence. The report gave the translator a score of 70% and ranked his services as "good" or "minimally acceptable" in all categories. Using a different interpreter, the IJ proceeded to hear additional testimony from Yosd. She then issued an oral decision, once again finding Yosd not credible and denying his requests for relief.

In this decision, the IJ noted many of the same inconsistencies in Yosd's testimony that she had noted in her first decision. In particular, she questioned the credibility of Yosd's

---

[3]We refer to this March 2005 hearing as the "second hearing."

testimony regarding when he was in hiding. At the second hearing, he testified that he went into hiding for several months following the arrest of two of his friends, but testified at various points during the hearing that this arrest occurred in May, June, and November 2001. Yosd also testified, as he had at the first hearing, that he was in hiding at his home from January 2001 to May 2001. Yosd's testimony made clear that Hun Sen supporters knew where he lived. Therefore, the IJ concluded that his statement that he was in hiding at home made "very little sense," particularly when paired with his testimony that he had obtained a passport and visa by traveling in person to the Cambodian passport office and the U.S. Embassy. The IJ also noted that, although Yosd had testified that two of his politically active friends had been arrested, he had "not established with any level of specificity that anybody ever really came looking for him or threatened to harm him in any way other than the one arrest" in September 1997, many years before he left Cambodia. Thus, the IJ concluded that Yosd's testimony, even with the benefit of a new interpreter at the second hearing, was "so inconsistent and lacking in detail as to be incredible."

On February 5, 2007, the BIA affirmed the IJ's decision, rejecting Yosd's claim that the IJ was biased against him and finding no clear error in her determination that Yosd's testimony lacked credibility. This petition for review followed, alleging

that the IJ's lack of impartiality in the second hearing violated Yosd's due process right to a hearing before a neutral finder of fact. See Kheireddine v. Gonzales, 427 F.3d 80, 84 (1st Cir. 2005) (quoting Marincas v. Lewis, 92 F.3d 195, 203-04 (3d Cir. 1996) (holding that one of the "most basic of due process protections" is "a hearing before a neutral immigration judge")).

## II.

We review Yosd's due process claim de novo. See Kheireddine, 427 F.3d at 83; Aguilar-Solís v. INS, 168 F.3d 565, 568 (1st Cir. 1999). That claim takes two forms. As an institutional matter, he argues that the BIA should never remand a case to the same IJ who had made a previous adverse credibility determination. He also argues that the conduct of the IJ at the second hearing demonstrated a bias that deprived him of a fair hearing. We find no merit in either argument.

### A. The Remand

In addressing the recusal of federal judges, the Supreme Court has noted that "[i]t has long been regarded as normal and proper for a judge to sit in the same case upon its remand." Liteky v. United States, 510 U.S. 540, 551 (1994); cf. Mass. Dist. Ct. local rule 40.1(K) (permitting further proceedings following a remand to be conducted before the same judge if that judge determines that "there will result a substantial saving in the time of the whole court and there is no reason why, in the interest of

justice, further proceedings should be conducted before another judge").  As the Liteky Court further explained:

> [O]pinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible.

Liteky, 510 U.S. at 555.[4]  In a case where an IJ's decision is vacated due to some misconduct on the judge's part, we agree that it would be wise for the BIA to order the case remanded to a new IJ for a second hearing.  See, e.g., Ti Wu Gao v. Gonzales, 200 Fed. Appx. 31, 34-35 (2d Cir. 2006) (unpublished) (directing the BIA to assign a case to a different judge on remand where the particular IJ's conduct had been found to suggest bias and hostility toward Chinese petitioners in three separate cases).  Cf. Sosnovskaia v. Gonzalez, 421 F.3d 589, 594 (7th Cir. 2005) (strongly encouraging the BIA to assign the case to a different judge on remand because the same IJ had twice found petitioner deportable, only to have one of her rulings reversed and the other vacated).  However, in Yosd's case, there was no allegation or finding of misconduct by the IJ

---

[4]Although the Liteky Court was analyzing a recusal statute, 28 U.S.C. § 455, that does not apply to immigration judges, Liteky nonetheless informs our analysis of allegations of judicial bias in the immigration context.  See Aguilar-Solís, 168 F.3d at 569 (citing Liteky in analyzing a due process claim against an IJ); Shu Ling Ni v. BIA, 439 F.3d 177, 180-181 (2d Cir. 2006) (applying Liteky in the context of an alien's allegation of bias against an IJ in an asylum hearing).

during the first hearing. Instead, the BIA simply found that the translation of Yosd's testimony by the interpreter had likely been inadequate. Under these circumstances, we find no fault with the BIA for remanding the case to the same IJ for further proceedings despite the adverse credibility finding in the first proceeding.

## B.  The Conduct of the IJ

To the extent that Yosd's due process claim is based on the IJ's conduct at the second hearing, it also fails. Yosd's bias allegations arise directly from the IJ's participation in Yosd's prior proceedings. To prevail under these circumstances, Yosd must "meet the substantial burden of proving that the IJ displayed a 'deep-seated favoritism or antagonism that would make fair judgment impossible.'" See Shu Ling Ni, 439 F.3d at 181 (quoting Liteky, 510 U.S. at 555). Yosd has not met this burden.

Yosd alleges that the IJ's conduct at the second hearing was improper because she chose to use that hearing to justify her prior ruling. In support of this claim, he cites her introduction into evidence at the second hearing of an evaluation of the quality of the translation during the first hearing. We fail to see how the IJ's request for an evaluation of the interpreter and her introduction of that evaluation into evidence provides proof of the IJ's bias. As she thoroughly explained during the hearing, the IJ believed that the errors noted by the BIA stemmed as much from inadequate transcription of the first hearing as from inadequate

-9-

translation services by the interpreter. She expressed concern that this was a chronic problem because the BIA reviews transcripts rather than audio tapes of the hearings. She explained that she was introducing the evaluation of the translation services into the record to illustrate to the BIA that errors in transcription may be to blame for what the BIA perceives to be an inadequacy in translation services. She noted that the evaluation of the translation in the prior hearing was "not something [she was] considering" during the second hearing. Instead, she felt it was "something for the Board to consider."

Yosd characterizes the IJ's introduction of the translation evaluation as an expression of "disdain or disagreement" with the remand itself. Even if that were the case, such disdain alone does not amount to a due process violation. See Aguilar-Solís, 168 F.3d at 569 (noting that "charges of judicial bias and partiality cannot be established solely by 'expressions of impatience, dissatisfaction, annoyance, and even anger'" (quoting Liteky, 510 U.S. at 555)). However, we disagree with Yosd's characterization and instead conclude, as the BIA did, that the IJ's request for an evaluation of the first interpreter and her submission of that evaluation to the BIA was "in support of an institutional concern for the integrity of interpretations before EOIR [the Executive Office of the Immigration Review], not to justify her prior ruling."

-10-

Yosd also contends that the IJ's bias was revealed in her comment at the outset of the second hearing that she was "going to send the case back to the Board unless [she saw] something different in the testimony here today to make [her] believe that [her] decision was incorrect." In context, this comment is merely a restatement of the IJ's understanding of the purpose of the remand. Earlier in the hearing, the IJ explained that the purpose of the second hearing was to use a new translator and to hear new testimony to "clarify anything that [Yosd's counsel] felt was not properly translated [and]. . . to clarify anything that maybe I misunderstood or was otherwise not properly translated." This statement of the purpose for the second hearing is consistent with the BIA's order that the IJ conduct further proceedings to allow the respondent to "meaningfully participate in the removal proceedings." Thus, we find nothing improper, much less any evidence of the deep-seated antagonism necessary to establish a due process violation, in the IJ's explanation that she would need to see "something different" during the second hearing in order to find Yosd credible.

Yosd next alleges that the IJ's "use of some of the testimony from the prior hearings to support her lack of credibility determination while ignoring other testimony further

-11-

illustrates her predisposition."[5]  We do not agree.  The IJ has broad discretion to consider unexplained inconsistencies as evidence of a lack of credibility.  See Mewengkang v. Gonzales, 486 F.3d 737, 739-40 (1st Cir. 2007) (holding that an alien may be found incredible based on unexplained discrepancies in testimony when the IJ provides specific and cogent reasons to conclude that the respondent's testimony was not credible).  The second hearing with a new interpreter afforded Yosd the opportunity to explain any inconsistencies he wished to explain.  Indeed, Yosd had the advantage of a prior decision pointing out the specific discrepancies with which the IJ was particularly concerned.  The fact that he failed to clarify these points in the second hearing is a proper ground for an adverse credibility finding and does not suggest that the IJ prejudged Yosd's credibility on remand.  Thus, we conclude that Yosd's due process claim fails.

## III.

We now turn to the merits of Yosd's asylum claim.  Under the highly deferential "substantial evidence" standard, we must uphold the IJ's finding that Yosd lacked credibility "unless any reasonable adjudicator would be compelled to conclude to the

---

[5]Yosd apparently does not argue that all of the testimony at the first hearing was tainted by the poor quality of the translation and thus that any reference to the testimony from the first hearing was inherently improper.  In fact, in his brief before this Court, Yosd cites exclusively to the transcript from the first hearing to establish his version of the facts of the case.

contrary."  8 U.S.C. § 1252(b)(4)(B); see also Kheireddine, 427

F.3d at 87.[6]  "Where the record supports plausible but conflicting

inferences . . . , the IJ's choice between those inferences is, a

fortiori, supported by substantial evidence."  López de Hincapie v.

Gonzales, 494 F.3d 213, 219 (1st Cir. 2007).

 The burden of proof is on the asylum applicant to

demonstrate, through credible testimony or corroborating evidence,

that he is a refugee either because he has suffered past

persecution or because he has a well-founded fear of future

persecution.  8 C.F.R. § 1208.13; Hoxha v. Gonzales, 446 F.3d 210,

216 (1st Cir. 2006).  As a result, an adverse credibility

determination, if supported by a "specific, cogent, and supportable

explanation," Heng v. Gonzales, 493 F.3d 46, 48 (1st Cir. 2007), is

generally fatal to an asylum applicant's claim for relief, Chen v.

Gonzales, 418 F.3d 110, 113 (1st Cir. 2005).[7]

---

[6]The REAL ID Act of 2005, Pub.L. 109-13, 119 Stat. 302, altered, among other things, the standards governing credibility determinations in asylum cases.  See 8 U.S.C. § 1158(b)(1)(B)(iii). However, the new provisions of the Act are not applicable to this case because Yosd's application for asylum was filed prior to the effective date of the amendments.

[7]An adverse credibility finding is similarly determinative of an alien's petition for withholding of removal and CAT protection. See Abdullah v. Gonzales, 461 F.3d 92, 97 (1st Cir. 2006) ("An alien who fails to satisfy the standard for asylum automatically fails to satisfy the more stringent standard for withholding of removal."); Hana v. Gonzales, --- F.3d ---,2007 WL 2696491, *4 (1st Cir. 2007) (noting that alien bears the burden of establishing a likelihood of torture to prevail on a CAT claim).

As described above, the IJ's decision detailed numerous inconsistencies that led to her conclusion that Yosd lacked credibility. Yosd attacks these inconsistency findings. First, he questions the IJ's determination that he failed to set forth any ongoing threats after he had left the country, noting that he had testified at his first hearing to incidents in which his wife had been questioned by Hun Sen followers about his whereabouts following his departure from Cambodia. However, the prior testimony about these incidents was vague; its lack of specificity could reasonably lead the IJ to infer that it lacked credibility. Yosd suggests that his vagueness could be attributed to his wife's hesitancy to give him details about the incidents for fear that he may return to Cambodia out of concern for her. Although this is one possible explanation for his vagueness, it is not the only reasonable one. We defer to the IJ's determination that the proper inference to be drawn from Yosd's lack of specificity is a lack of truthfulness.

Next, Yosd questions the adverse inference the IJ drew from Yosd's original testimony that he had destroyed his Sam Rainsy Party membership card, followed by Yosd's introduction of just such a membership card in a subsequent hearing. Yosd argues that "a fair reading of the transcript of the prior hearing seems to suggest" that the card produced was a duplicate sent to him by his wife. Again, that _is_ one possible reading of the testimony

-14-

regarding the card, but it is not the only reading. As Yosd himself admits, his testimony on this point was confusing. The IJ's finding that his production of the card demonstrated a lack of credibility is one reasonable inference to be drawn from the juxtaposition of his testimony and his subsequent production of a membership card.

Finally, Yosd contends that the IJ erred in finding his testimony lacking in credibility based on his assertion that he went into hiding away from his home for five or six months, from May or June 2000 until January 2001, followed by his detailed description of being at home in November 2000 when two of his friends were arrested for their political activities. Although the IJ noted that Yosd had difficulty with dates, this particular inconsistency transcends a mere difficulty with dates and goes to the heart of his claim of past persecution. Our review of the transcripts leads us to conclude, as the IJ did, that it is unclear when and where Yosd was hiding. Although Yosd argues that the "confusion may easily have stemmed from the fact that [he] did go into hiding for five months following the coup of 1997," it is also reasonable to find, as the IJ did, that the confusion stems from a fabricated story.

**IV.**

In sum, we conclude that Yosd was afforded full due process on remand. We find that the IJ's adverse credibility

-15-

finding following the second hearing was supported by a "specific, cogent, and supportable explanation."  Thus, we deny the petition for review.

**<u>So ordered</u>**.