# United States Court of Appeals
## For the First Circuit

No. 07-2606

FEKI OROH,

Petitioner,

v.

ERIC H. HOLDER,JR.[*] Attorney General,

Respondent.

ON PETITION FOR REVIEW OF AN ORDER OF
THE BOARD OF IMMIGRATION APPEALS

Before

Boudin, Lipez and Howard,
<u>Circuit Judges</u>.

<u>William A. Hahn</u> and <u>Hahn & Matkov</u> for petitioner.
<u>Gregory G. Katsas</u>, Assistant Attorney General, Civil Division,
<u>Cindy Ferrier</u>, Senior Litigation Counsel and <u>Michele Y.F. Sarko</u>,
Attorney, Office of Immigration Litigation, Civil Division, United
States Department of Justice for respondent.

March 27, 2009

---

[*]Pursuant to Fed. R. App. P. 43(c)(2), Eric H. Holder, Jr. is
automatically substituted for former Attorney General Michael B.
Mukasey as the respondent herein.

**HOWARD**, **Circuit Judge**.  Feki Oroh, an Indonesian national, entered the United States in September 1994, pursuant to a visa valid until March 1995.  He remained in the United States beyond the expiration of his visa.  In April 2003, the Department of Homeland Security ("DHS") issued Oroh a Notice to Appear.  Oroh admitted his removability, and in March 2004 sought asylum, withholding of removal, and protection under the Convention Against Torture ("CAT").  Following a hearing, an Immigration Judge ("IJ") denied Oroh's applications in September 2005.  The Board of Immigration Appeals ("BIA" or "the Board") affirmed the IJ and dismissed the appeal.  This timely petition followed.[1]  We deny the petition.[2]

## I.

The substantive basis of Oroh's application is fear of religious persecution.  Oroh is Christian, Indonesia's population and government is predominantly Muslim, and there has undeniably been violent sectarian conflict between the two groups.  Before we address the question of whether this violence constitutes

---

[1]  Since Oroh did not raise his CAT claim in his brief, it is not before us.  See Ly v. Mukasey, 524 F.3d 126, 132 n.3 (1st Cir. 2008) ("On appeal, Ly did not pursue her claim of torture in support of protection under the CAT, and therefore, that basis for her application is deemed waived.").

[2]  Where, as here, the BIA both adopts the IJ's decision and adds its own reasoning for upholding the IJ's decision, we review the IJ's decision "as though it were the BIA's to the extent of the adoption, and the BIA's decision as to the additional grounds." Berrio-Barrera v. Gonzales, 460 F.3d 163, 167 (1st Cir. 2006).

persecution such that Oroh is entitled to relief, we must resolve two procedural matters: 1)Oroh's claim that certain defects in the transcript of his hearing before the IJ violate BIA regulations, thus entitling him to remand; and 2)the government's two-pronged argument that the BIA correctly determined that Oroh's asylum application was untimely and that we lack jurisdiction to review that determination.

## A.  The transcript

Oroh first argues that he is entitled to relief because the 40-page transcript of his hearing before the IJ contains 137 uses of the term "indiscernible" in place of text.  He bases this contention on 8 C.F.R. § 1003.1(e)(2), which provides that an alien is entitled to have an adequate record on which to base an appeal, and 8 C.F.R. § 1240.9, which provides that "hearings shall be recorded verbatim except for statements made off the record with the permission of the immigration judge."  The BIA's failure to follow its own regulations, Oroh asserts, warrants reversal of the BIA and remand for a new hearing.

The BIA rejected Oroh's transcript-based claim because he failed to show that he was prejudiced.  Specifically, the BIA found that Oroh failed to establish that any material testimony was not reflected in the transcript.  And in reviewing the transcript, the Board was unable to identify any aspect of material testimony that had been omitted.  On appeal, Oroh argues that no showing of

prejudice is necessary because the regulatory violation alone is sufficient to trigger remand.

We are not strangers to the problem of incomplete transcripts in immigration cases. See, e.g., Kheireddine v. Gonzales, 427 F.3d 80, 82 (1st Cir. 2005) ("[T]he problem of missing portions of transcripts is a recurring one"); Munoz-Monsalve v. Mukasey, 551 F.3d 1, 9 (1st Cir. 2008) (missing transcript of calendar conference); Teng v. Mukasey, 516 F.3d 12, 17 (1st Cir. 2008) (transcript contained a "modest number of 'indiscernible' notations). In addition, we understand that "[s]uch persistent problems put at risk the ability of the courts of appeals to provide meaningful and effective appellate review." Kheireddine, 427 F.3d at 85. Thus, we have held that "due process demands a 'reasonably accurate, reasonably complete transcript,' or an adequate substitute, to allow for meaningful and adequate appellate review." Id. at 84 (quoting Ortiz-Salas v. INS, 992 F.2d 105, 106 (7th Cir. 1993)).

At the same time, however, "a mere failure of transcription, by itself, does not rise to the level of a due process violation." Id. at 85. Instead, to succeed on a claim of inadequate transcription, Oroh must show "'specific prejudice to his ability to perfect an appeal' sufficient to rise to the level of a due process violation." Teng, 516 F.3d at 18 (quoting Kheireddine, 427 F.3d at 85). More specifically, he must "show at

a bare minimum that the gaps relate to matters material to his case" and that they "materially affect his ability to obtain meaningful review." Munoz-Monsalve, 551 F.3d at 9. Finally, if the missing information "could reasonably be recreated by the complaining party, then its absence is not prejudicial." Id. (citing Kheireddine, 427 F.3d at 86).

Perhaps recognizing the weight of contrary authority, Oroh argues that he need not show prejudice because he is not claiming a due process violation. Oroh not only ignores the plain language of Teng, which requires due process-level prejudice to succeed on a claim of inadequate transcription, 516 F.3d at 18, but he supplies no authority for his implicit proposition that the alleged regulation violation alone -- absent prejudice -- entitles him to relief.[3]

Despite his reliance on an inapposite legal theory, Oroh brought to the BIA's attention several portions of the transcript from which he claimed important substantive testimony was lacking. Our review of the four referenced pages does not support Oroh's contention. In each case, the gist of the missing words can be inferred from their context. Most importantly, however, all of the missing information came during testimony from Oroh himself, or

---

[3] Oroh cites to Nelson v. INS, 232 F.3d 258 (1st Cir. 2000), but that case -- in which the court ultimately found that no violation had occurred -- noted only that the failure to follow a regulation can lead to a reversal and remand, not that such a remedy is always required. Id. at 262.

were comments by his attorney, who continues to represent him on appeal. As such, the "missing" information is readily available to Oroh, yet was never provided -- by affidavit or otherwise -- to the BIA or this court. "The law is pellucid that if a missing transcript reasonably could be recreated by the complaining party, its absence is not prejudicial." Munoz-Monsalve, 551 F.3d at 9 (citing Kheireddine, 427 F.3d at 86). In the absence of prejudice, Oroh's transcript-based claim is rejected.

## B. Timeliness of the asylum application

An asylum application must ordinarily be filed "within one year after the date of the alien's arrival in the United States," 8 U.S.C. § 1158(a)(2)(B), or by April 1, 1998, whichever is later. 8 C.F.R. § 1208.4(a)(2)(ii). Late applications can be considered, however, if an applicant demonstrates "changed circumstances which materially affect the applicant's eligibility for asylum or extraordinary circumstances relating to the delay in filing," and if the applicant filed the application "within a reasonable period" given those circumstances. 8 U.S.C. § 1158(a)(2)(D); 8 C.F.R. §§ 1208.4(a)(4), (5); Rashad v. Mukasey, 554 F.3d 1, 4 (1st Cir. 2009). It is the applicant's burden to establish that the application is timely filed or that he qualifies for an exception. 8 C.F.R. § 1208.4(a)(2)(i).

Here, Oroh does not dispute that his application -- filed in March 2004 -- was untimely, given his entry into the United

-6-

States in 1994. He instead seeks the protection of the "changed circumstances" exception in 8 U.S.C. § 1158(a)(2)(D).[4] The IJ found that Oroh failed to prove that he filed in a timely fashion after any change of conditions. In affirming the IJ, the BIA was "unable to identify any material changes that occurred in Indonesia within a reasonable period prior to the application."

Before we can reach the substance of Oroh's timeliness argument, he must clear the formidable hurdle created by 8 U.S.C. § 1158(a)(3), which divests courts of jurisdiction to review determinations of timeliness or the applicability of exceptions to the one-year rule. See Hana v. Gonzales, 503 F.3d 39, 42 (1st Cir. 2007). The only exception to this bright-line rule is contained in 8 U.S.C. § 1252(a)(2)(D), which carves out an exception allowing courts to review "constitutional claims or questions of law." Id. Oroh does not assert a constitutional argument on appeal. He claims, however, that the IJ and BIA made errors of law by not defining "reasonable time period," and not identifying the changed circumstances that implicitly occurred outside said period.

Given that Oroh bears the burden of proof on these issues, 8 C.F.R. § 1208.4(a)(2)(i), his assignation of error is unavailing. In essence, he is seeking to shift the burden to the IJ and BIA to disprove facts which Oroh never proved in the first

---

[4]    Specifically, Oroh argues that changed circumstances in his native Indonesia materially affect his eligibility for asylum. See 8 C.F.R. § 1208.4(a)(4)(i)(A).

-7-

place, i.e., how any changed conditions in Indonesia affected his ability to comply with the one-year deadline and the facts and circumstances that made his delay until 2004 "reasonable." In our view, he is saying nothing more than "'the agency got the facts wrong,' which is simply a factual claim masquerading as a legal challenge that certainly cannot defeat the jurisdiction-stripping provision of'" 8 U.S.C. § 1158(a)(3). Rashad, 554 F.3d at 5 (citing Pan v. Gonzales, 489 F.3d 80, 85 (1st Cir. 2007) ("To trigger our jurisdiction, the putative constitutional or legal challenge must be more than a disguised challenge to factual findings.")). Both the IJ and the BIA concluded that no exceptions applied to excuse Oroh's untimely asylum application. We are without jurisdiction to review that conclusion.

## C. Withholding of removal

To qualify for withholding of removal, Oroh must show by a clear probability that he will be persecuted in Indonesia because of his "race, religion, nationality, membership in a particular social group, or political opinion." Ly, 534 F.3d at 132. See 8 U.S.C. § 1231(b)(3)(A); 8 C.F.R. § 1208.16(b).[5]

Before entering the United States, Oroh lived with his wife and two children in Manado, Indonesia, a town near the

---

[5] Applicants can also prove past persecution, which gives rise to a rebuttable presumption of future persecution. 8 C.F.R. § 1208.16(b)(1)(i). Oroh does not contest the findings below that he suffered no past persecution.

-8-

northern end of the island of Sulawesi. As of the September 2005 hearing, his wife and daughter were still living in Manado. They visited Oroh in the United States in 1999, and returned to Indonesia five months later upon the death of his wife's parents. Oroh's son came to the United States in 2000 and sought asylum.

Oroh and his family are practicing Christians, a religion to which approximately ten percent of Indonesians belong. The nation is ninety percent Muslim. Oroh had intended to go back to Indonesia, but following the overthrow of President Suharto in 1998, he became concerned about violence directed at Christians by Muslims.

Oroh testified that his wife had told him of riots, bombings and threats to churches that took place in 1998. However, Oroh testified that such threats were not generally taking place in his home area, but in a portion of Sulawesi that was a one-hour plane trip or twelve to fifteen hour drive away. He also testified that his wife had heard of threats in the area, that she was afraid of her church getting bombed, and that their daughter left her public school for a month out of fear after a bomb scare, although she later returned, apparently without incident. He filed his application because he fears religious reprisal if he is returned to Indonesia.

Although Oroh was the only person to testify before the IJ, the record contains various U.S. State Department Country

Reports on human rights practices and religious freedoms. Taken together, they paint a picture of a nation whose constitution provides religious freedom, a drop in religion-based violence in Sulawesi, and a general improvement in religious tolerance nationwide. While tension between equal populations of Christians and Muslims led to twenty-two deaths in 2002 and 2003 in central Sulawesi, 2004 saw government-aided advances in defusing hostility there. The reports also indicate that the government has made progress in prosecuting those responsible for sectarian violence and terrorist acts.

Moreover, the U.S. Department of State's 2004 International Religious Freedom Report notes that Muslims are a distinct minority in several areas of Indonesia, including Oroh's native North Sulawesi, which has seen considerably less violence than other areas. And while one bombing did take place there, the Prime Minister traced it to terrorists trying to prevent peaceful coexistence, and not warring Muslim or Christian factions.

In denying Oroh's request for withholding or removal, the IJ took into account Oroh's testimony and the various State Department reports. While acknowledging that his native land was more dangerous than the United States, the IJ concluded that Oroh's area of residence presented relatively little danger. The IJ noted that any recent terrorist attacks did not seem to be targeting Christians, and most importantly, the fact that Oroh's wife,

daughter and parents were able to live in Manado without religious restriction weighed heavily against the application. Thus, the IJ concluded that Oroh had failed to meet his burden of proving that he would more likely than not face persecution upon his return. The BIA agreed with the IJ, highlighting the fact that Oroh's family still lived untroubled in Indonesia. See Khan, 549 F.3d at 577 (continued safety of applicant's family undercuts claim of future persecution).

We uphold the decisions below if their factual bases are "'supported by reasonable, substantial, and probative evidence on the record considered as a whole.'" Sombah v. Mukasey, 529 F.3d 49, 51 (1st Cir. 2008) (quoting INS v. Elias-Zacarias, 502 U.S. 478, 481 (1992)). Under this deferential "substantial evidence" standard, "findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." Id. (citation and quotation marks omitted).[6]

Oroh argues that the IJ and BIA considered only "one side of the story," ignoring the negative implications in the record while focusing on the positive. We disagree. Both the IJ and the BIA considered the totality of the conditions in Indonesia in general, in Oroh's home area in particular, and, as required by

---

[6] Oroh urges us to apply "heightened scrutiny" to his claim due to Indonesian laws and policies regarding religion. We do not consider this argument because Oroh did not present it to the BIA. Sombah, 529 F.3d at 52.

law, the nexus between any violence and Oroh's Christian faith. "The mere fact that those decision makers weighed the constituent parts differently and reached a conclusion not to the petitioner's liking does not constitute a valid reason for overturning the agency's judgment." Pulisir v. Mukasey, 524 F.3d 302, 309 (1st Cir. 2008). While the country condition reports do suggest some state-sponsored discrimination against Christians in parts of Indonesia, such evidence does not suffice to meet Oroh's burden of proving "that more likely than not, he would be subject to persecution on account of" his religion. See Pulisir, 524 F.3d at 308-09. "To qualify as persecution, a person's experience must rise above unpleasantness, harassment, and even basic suffering." Nelson, 232 F.3d at 263. Here, given the relative stability of Manado and North Sulawesi, and Oroh's family members' apparent ability to live there and practice their religion, Oroh's claim falls short.

The petition is **denied**.