NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Submitted March 29, 2013[*]
Decided March 29, 2013

**Before**

WILLIAM J. BAUER, *Circuit Judge*

RICHARD A. POSNER, *Circuit Judge*

ANN CLAIRE WILLIAMS, *Circuit Judge*

No. 12-3688

| | |
|---|---|
| ANDRÉ W. WEBSTER,<br>*Petitioner*, | Petition for Review of an Order of the<br>Board of Immigration Appeals. |
| *v.* | A045-308-157 |
| ERIC H. HOLDER, JR.,<br>Attorney General of the United States,<br>*Respondent*. | |

## O R D E R

André Webster, a citizen of Guyana, petitions for review of an order of the Board of Immigration Appeals upholding an immigration judge's denial of his application for asylum and withholding of removal. We deny the petition for review.

Webster entered the United States in 1996, at the age of 30, as a lawful permanent resident based on a petition from his mother, a naturalized U.S. citizen. He was convicted

---

[*] After examining the parties' briefs and the record, we have concluded that oral argument is unnecessary. Thus, the petition for review is submitted on the briefs and the record. *See* FED. R. APP. P. 34(a)(2)(C).

of possessing cocaine in 2001, *see* 720 ILCS 570/402(c), and in 2012 he was placed in removal proceedings, *see* 8 U.S.C. § 1127(a)(2)(B)(i). Webster's receipt of the Notice to Appear prompted him to apply for asylum and related relief on account of his race, religion, nationality, political opinion, and membership in a social group. But other than identifying himself as black, Webster did not elaborate on these classifications in his application or explain their connection to his claim for asylum. On the form he checked "no" when asked if he ever had been harmed or mistreated or threatened by "anyone." He also checked "no" when asked if he ever had been "accused, charged, arrested, detained, interrogated, convicted and sentenced, or imprisoned in any country" outside the United States. Yet in his application Webster asserted fearing harm by racists, by Guyanese citizens who would deem him a "foreigner" because of his extended absence from their country, and by criminals who would assume that anyone coming from the United States would be carrying dollars. Webster wrote that he had served in the "Guyana Police Force" for two years during the early 1980s but did not mention any negative consequences of that service or describe at all his life in Guyana, where he left behind three young children.

At his hearing before an immigration judge, Webster then described a number of events and details not appearing in his written application. He testified that as a police officer he was not allowed to grow dreadlocks, despite his Rastafarian beliefs, and was required to support the People's National Congress (which was ousted in a 1992 election almost four years before Webster came to the United States, and has not controlled the government since. *See* Freedom House, *Freedom in the World 2012: Guyana* (Mar. 22, 2013), http://www.freedomhouse.org/report/freedom-world/2012/guyana). Webster now contradicted his asylum application and said that he lost his job on the police force after he was accused of theft and, until being exonerated, was held in jail where he was threatened by other prisoners. He described racial tensions between the two largest ethnic groups (the Indo-Guyanese and the Afro-Guyanese). Webster testified that he was searched by Guyanese police officers who associate dreadlocks with drug use and said he was chased by Indo-Guyanese residents who did not want him in their neighborhood. Webster's mother testified that she had twice visited Guyana in the 2000s and that there was a lot of crime; she also recounted that one of her other sons had been chased by Indo-Guyanese as a child in the 1960s and was injured while trying to escape. Webster's girlfriend and niece testified on his behalf, but neither provided additional details about Guyana. Webster also submitted the State Department's 2010 Human Rights Report for Guyana, which describes complaints of mistreatment by police officers and poor prison conditions; Freedom House's "Freedom in the World 2012" report on Guyana, discussing the racial tensions between the two main political parties; a Guyanese newspaper reporting the death of a man who was stabbed at a bar after a political argument in 2011 (he had been deported from the United States 11 years prior); another Guyanese newspaper article criticizing the Guyanese consulate in New York for facilitating deportations; a website reporting comments about

dehumanizing conditions in Guyanese prisons made by an spokesman for the Caribbean Community Secretariat (an organization representing 15 Carribean nations); and a letter from his mother asserting that Indo-Guyanese have killed Afro-Guyanese.

The immigration judge found that Webster was lying about the difficulties he allegedly experienced in his home country, none of which appears in his written application. She rejected Webster's explanation that he never realized the need to provide details in his written application because he lacked assistance in filling out the application; the immigration judge noted that Webster is a native English speaker (English is the official language of Guyana, a former British colony), and he understood and easily responded to questions at the hearing. Concerning Webster's purported fear of future harm, the immigration judge found that Webster had not established a threat of violence to Guyanese citizens who leave the country and return after been deported from another country. The Board of Immigration Appeals upheld the adverse credibility finding and concluded that Webster had not met his burden of proof for showing a well-founded fear of persecution.

In his petition for review Webster argues that the immigration judge erred in finding him not credible. According to Webster, the comments from the Carribean Community official and passages of the Country Report discussing poor conditions in Guyanese prisons corroborate his claim of being mistreated in jail after being accused of theft. In assessing credibility, an immigration judge may weigh inconsistencies between hearing testimony and earlier statements, particularly when the applicant previously failed to mention events central to his claim. 8 U.S.C. § 1158(b)(1)(B)(iii); *Hassan v. Holder*, 571 F.3d 631, 637–39 (7th Cir. 2009); *Tarraf v. Gonzales*, 495 F.3d 525, 532-33 (7th Cir. 2007). Here, Webster previously had asserted, in a written application signed under oath, that never was he accused of a crime or detained in Guyana, and neither did he experience "harm or mistreatment or threats" from "anyone," thus directly contradicting his hearing testimony. In his application he did not mention adherence to Rastafarianism, membership in a political party, or threats from Indo-Guyanese people. Given the omission of multiple, nontrivial details, and his inability to explain why these events were omitted from his application, we conclude that substantial evidence supports the immigration judge's adverse credibility finding. *See Rama v. Holder*, 607 F.3d 461, 465–66 (7th Cir. 2010); *Aung v. Gonzales*, 495 F.3d 742, 746 (7th Cir. 2007).

Webster also argues that he was denied a fair hearing because parts of the audio recording from the hearing are unintelligible and thus could not be transcribed. The gaps, Webster points out, appear only where he or his witnesses testified. The 122-page transcript has 39 notations of "indiscernible" (a few of which were promptly clarified when the immigration judge asked the witness to repeat a statement). Although a complete record of all testimony is required for immigration proceedings, 8 U.S.C. § 1229a(b)(4)(C), the

explanation for the small gaps appears in the transcript itself, where the immigration judge reminds both Webster and his mother to speak directly into the microphone. These inaudible portions did not taint the proceedings with unfairness; Webster had a reasonable opportunity to present evidence and witnesses, *see Kholyavskiy v. Mukasey*, 540 F.3d 555, 565 (7th Cir. 2008); *Apouviepseakoda v. Gonzales*, 475 F.3d 881, 885 (7th Cir. 2007), and he has not made any effort, such as submitting an affidavit based on his own recollection, to show that the untranscribed testimony was material to his appeal, *see Ortiz-Salas v. INS*, 992 F.2d 105, 106–07 (7th Cir. 1993); *Munoz-Monsalve v. Mukasey*, 551 F.3d 1, 9 (1st Cir. 2008) ("[A] petitioner must show at a bare minimum that the gaps relate to matters material to his case and that the absence of missing transcripts is prejudicial."); *see also Singh v. Holder*, 699 F.3d 321, 336 (4th Cir. 2012); *Oroh v. Holder*, 561 F.3d 62, 64–66 (1st Cir. 2009); *Garza-Moreno v. Gonzales*, 489 F.3d 239, 241–42 (6th Cir. 2007).

PETITION DENIED.