# United States Court of Appeals
## For the First Circuit

No. 23-1036

EVELIN RAQUEL MONTOYA-LOPEZ,

Petitioner,

v.

MERRICK B. GARLAND, United States Attorney General,

Respondent.

PETITION FOR REVIEW OF AN ORDER OF
THE BOARD OF IMMIGRATION APPEALS

Before

Barron, Chief Judge,
Lynch and Gelpí, Circuit Judges.

Kevin P. MacMurray and MacMurray & Associates on brief for petitioner.

Brian M. Boynton, Principal Deputy Assistant Attorney General, Civil Division, Brianne Whelan Cohen, Senior Litigation Counsel, Office of Immigration Litigation, and Christina R. Zeidan, Trial Attorney, Office of Immigration Litigation, Civil Division, U.S. Department of Justice, on brief for respondent.

August 21, 2023

**LYNCH**, **Circuit Judge**.  Evelin Raquel Montoya-Lopez petitions for review of a decision of the Board of Immigration Appeals ("BIA") affirming the immigration judge's ("IJ") order denying her application for asylum and withholding of removal under sections 208(b)(1)(A) and 241(b)(3)(A) of the Immigration and Nationality Act ("INA"), 8 U.S.C. §§ 1158(b)(1)(A), 1231(b)(3)(A), as well as relief under the Convention Against Torture ("CAT").

In its decision, the BIA adopted and affirmed the IJ's denial, agreeing that the petitioner "did not establish past persecution or a well-founded fear of future persecution on account of one of the protected grounds enumerated in section 101(a)(42)(A) of the INA, 8 U.S.C. § 1101(a)(42)(A)."  First, the IJ determined that the petitioner had not demonstrated past persecution.  Second, the IJ determined that, although the petitioner had a well-founded fear of future persecution, there was no nexus between this fear and her status as a member of a particular social group, because neither of the two social groups the petitioner alleged -- "family members of business owners perceived as wealthy" and "people who have fled the gangs instead of continuing to pay extortion" -- was cognizable under the particular social group criteria.

Because substantial evidence supports the IJ's factual determinations and the BIA committed no errors of law in its ruling, we deny the petition for review of the petitioner's asylum and withholding of removal claims.  Having failed to raise issue

- 2 -

with the BIA's denial of CAT relief on appeal to this court, the petitioner has waived this claim, and we deny that portion of her petition as well.

## I.

### A.

The petitioner is a 30-year-old native and citizen of El Salvador. She came to the United States on or about March 13, 2016, without inspection by an immigration officer. The petitioner is unmarried and has two children, ages six and four, who were born in the United States. Her parents and three of her five siblings live in El Salvador, while her remaining two siblings live in the United States. She obtained her "bachillerato" -- the equivalent of a U.S. high school degree -- in El Salvador.[1] Prior to her arrival in 2016, she had never before visited the United States.

Before leaving for the United States on March 5, 2016, the petitioner lived in San Miguel, El Salvador, with her sister Delmy.[2] Her parents lived, and still reside, in San Miguel as

---

[1] For more information on the bachillerato degree program in El Salvador, see El Salvador, AACRAO Edge, https://www.aacrao.org/edge/country/el-salvador (last visited Aug. 17, 2023).

[2] In her testimony before the IJ on September 15, 2020, the petitioner stated that she was living in San Miguel, El Salvador, before coming to the United States, though later during the same hearing she testified that she had lived in San Ramon, El Salvador, until March 2016, but moved to San Miguel to be closer

- 3 -

well.  She sold fruits and vegetables at a stand Delmy owned in a busy market in San Miguel, where she earned $10 per day.  She worked Monday through Saturday from 1:00 am until 2:00 pm or 4:00 pm, mostly alone, as her sister spent much of this time purchasing additional produce to sell the following day.

In her testimony before the IJ, the petitioner stated that after she had been working at her sister's fruit and vegetable stand for between one and two years[3] and the business became more profitable, members of the MS-13 gang began to extort money from the business.  In the first instance, two men she identified as gang members based on their baggy clothing approached her while she was selling produce alone and gave her a phone, telling her someone wanted to speak to her.  When she answered, the person on the other end of the line, whom she believed to be in the MS-13 gang, stated that he was in jail, and that since he had observed her making a "good profit" at the fruit and vegetable stand, she and her sister needed to pay some "rent," or extortion money, of

---

to her sister's business.  This inconsistent timeline has not been raised as an issue on appeal.

[3]    On direct examination during her hearing in front of the IJ, the petitioner stated that she had been working at her sister's fruit and vegetable stand for approximately one year when she was first approached by the gang members, but on cross-examination during the same hearing, she stated that she had been working at the stand for "like two years" when the extortion began.

$25 per week.[4] He then stated "you already know what can happen to you" if the petitioner did not pay the extortion money, which she understood to mean that they could kill her. Based on her experience in El Salvador and her knowledge that "they kill a lot of people over there because of that," she believed this threat. When she told her sister about the threat, her sister told her to pay the fee, "otherwise they will hurt us."

The petitioner began to make these extortion payments on a weekly basis from the profits of the fruit and vegetable stand. Because her sister was never present at the stand when they visited, the gang members only ever collected money from the petitioner. She believed that the gang had not extorted money from the stand before she began working there because it had originally been a smaller and not as profitable operation; once Delmy had hired her and purchased more merchandise for the stand, the gang assumed that the stand was making more money and decided to seek extortion payments.

When business was poor, the petitioner and her sister used the petitioner's personal earnings from working at the stand to pay the extortion money. Over the course of one year, the

---

[4] In her memorandum in support of her Form I-589 Application for Asylum, the petitioner stated that the original extortion amount was $5 per week, but before the IJ, she said that the original amount was $25 per week. The IJ adopted the $25 per week amount in her oral decision.

extortion payments increased, from $25 to $35, $50, and then $75, at which point the stand's profits were insufficient to continue paying.[5] In order to pay the extortion money, the petitioner's sister began to buy fruits and vegetables for the stand on credit and use the profits to pay the gang members instead.

The petitioner stated that she did not believe that the police could protect her from the gang in El Salvador because the gang members also threaten the police for protecting civilians. Yet she also stated that she and her sister never reported the extortion to the police because she believed that the police would arrest and prosecute the gang members if she identified them, and she was afraid that the gang members had infiltrated the police and would take revenge against her and Delmy for reporting by killing them.

In the final weeks before the petitioner left for the United States, she informed the gang members that due to low sales at the stand, she and her sister could not afford the extortion

_____

[5] In her memorandum in support of her asylum application, the petitioner stated that the original extortion amount was $5 per week, which increased to $10 and then, after a few months, $50 per week, but before the IJ, she said that the original amount was $25 per week, which increased to $35, then $50, and finally $75. The IJ adopted the starting point of $25 per week and subsequent escalations in her oral decision. Additionally, before the IJ, the petitioner stated that the amounts increased over one year, but in the affidavit attached to her asylum application she stated that "[t]he threats began approximately seven months before I left El Salvador."

- 6 -

payments, to which the gang members stated that they just wanted the payments and did not care whether the stand produced enough profits to provide them. She stated that she ultimately left El Salvador out of fear that her sister could not afford to pay the extortion money and the petitioner would be held responsible as the individual who had been present at the stand delivering the payments. She believed that by leaving El Salvador, rather than continuing to pay extortion, she put herself in danger from the gang, as she could recognize the gang members and identify them as extortioners to other people and the police.

After the petitioner left El Salvador, her sister Delmy remained in El Salvador and continued to make extortion payments to the gang members. At the time of her hearing in front of the IJ, the petitioner had not spoken to her sister in over a year. The last she had heard, Delmy had closed the fruit and vegetable stand, though she did not know with certainty whether Delmy was still operating the stand. She also said that in their last conversation, Delmy had told her that the gang members had continued to charge the $75 per week extortion and she planned on filing a police report against them, but the petitioner learned from her mother that ultimately Delmy did not file a report. The petitioner's mother also stated during this conversation that Delmy wanted to go to Nicaragua or Panama.

The petitioner testified that she is afraid to return to El Salvador and claimed she does not have a place where she can live there outside of San Miguel. She had previously lived in San Ramon, Cuscatlán, El Salvador, a three-to-four hour bus ride from San Miguel, with her sister, but claimed that she could not go back there either because it is "a very dangerous place as well." No one ever threatened or harmed her personally in San Ramon. She believed gang members had killed several of her family members there, including her cousin and her cousin's child, another cousin, and a third cousin's husband. She testified that no arrests had been made regarding those deaths, and her knowledge of the perpetrators was based on reports from family members and is uncorroborated by other evidence. She did not know why any of her relatives were killed.

Before the IJ, the petitioner continued testifying that she does not know whether the gang members asked about her or attempted to look for her after she left El Salvador.[6] She did not attempt to relocate within El Salvador before leaving for the

---

[6]    The petitioner stated she was not sure whether the MS-13 gang members had asked about her, but in the affidavit attached to her asylum application, she stated, "The MS-13 has asked for me, and my sister lied and told them that I was no longer working there because I had messed up the business and would no longer be working there. She did this because if she told them that I had come to the United States, she was afraid that the MS-13 would try to find me and continue extorting me." The IJ did not mention this discrepancy in her opinion, and the petitioner did not raise it as an issue on appeal.

United States.  The petitioner had not been physically harmed by the gang members at the time she left El Salvador.  When asked whether, to her knowledge, Delmy had been threatened or physically harmed since the petitioner left El Salvador, the petitioner stated that the last thing Delmy had told her was that she intended to file a police report because of continued extortion and that sales were bad.  The petitioner had told her to be careful.

**B.**

The petitioner was placed into removal proceedings by the Department of Homeland Security through a Notice to Appear filed on August 5, 2016, charging her with removability pursuant to 8 U.S.C. § 1182(a)(6)(A)(i).  She filed an application for asylum on March 7, 2017.  At a hearing before the immigration court on December 6, 2017, the IJ found her removable and directed El Salvador as the country for removal.

At her 2020 hearing before the IJ, the petitioner was represented by counsel.  She testified as the sole witness and submitted a written declaration in support of her application. She claimed that although she had told her family members about the extortion she experienced in El Salvador, none of her family members in El Salvador provided statements in support out of fear of retaliation against them if they spoke against the gang members, and she was not aware that she could provide statements from family members located outside of El Salvador.  The IJ found the

- 9 -

petitioner to be a credible witness.

After hearing her testimony, the IJ denied the petitioner's application for asylum, withholding of removal, and CAT relief, finding that (1) the petitioner's experiences in El Salvador fell below the level of harm necessary to establish past persecution and (2) although the petitioner had demonstrated a well-founded fear of future persecution, she had not met the criteria for asylum or withholding of removal regarding the two separate particular social groups she claimed. The IJ determined that the petitioner's first claimed group, "family members of a business owner perceived as wealthy," was not a valid particular social group because it did not satisfy the requirement of immutability. The IJ also determined that the petitioner's second claimed group, "people who have fled gangs instead of continuing to pay extortion," was not a valid particular social group because it failed the requirement of being perceived as a distinct group within El Salvador. The BIA adopted the IJ's findings of fact and affirmed its legal conclusions; it held that the petitioner's second claimed group failed because it was "based purely on fear of crime and economic extortion."

This timely petition for review followed.

## II.

We review the BIA's conclusions of law de novo but provide "some deference to the agency's expertise in interpreting

- 10 -

both the statutes that govern its operations and its own implementing regulations." Cabrera v. Lynch, 805 F.3d 391, 393 (1st Cir. 2015). Where, as here, the BIA adopted the IJ's findings of fact, "we review both the IJ's and the BIA's decisions as a unit." Mazariegos-Paiz v. Holder, 734 F.3d 57, 64 (1st Cir. 2013) (quoting Chen v. Holder, 703 F.3d 17, 21 (1st Cir. 2012)); see also Camara v. Holder, 725 F.3d 11, 14 (1st Cir. 2013). We use the "substantial evidence standard," a deferential standard that "requires us to accept the [IJ's] factual findings . . . unless the record is such as to compel a reasonable factfinder to reach a contrary conclusion." Dorce v. Garland, 50 F.4th 207, 212 (1st Cir. 2022) (omission in original) (quoting Mazariegos-Paiz, 734 F.3d at 64); see also INS v. Elias-Zacarias, 502 U.S. 478, 481 (1992). "That the record supports a conclusion contrary to that reached by the BIA [or IJ] is not enough to warrant upsetting the BIA's [or IJ's] view of the matter." Lopez de Hincapie v. Gonzales, 494 F.3d 213, 218 (1st Cir. 2007); see also Arkansas v. Oklahoma, 503 U.S. 91, 113 (1992) (holding that when using the substantial evidence standard, courts of appeals "should not supplant [an] agency's findings merely by identifying alternative findings that could be supported by substantial evidence").

A.

We begin with the petitioner's asylum application. To succeed, the petitioner bears the burden to "'demonstrate a well-founded fear of persecution on one of five protected grounds' -- race, religion, nationality, political opinion or membership in a particular social group." Paiz-Morales v. Lynch, 795 F.3d 238, 243 (1st Cir. 2015) (quoting Singh v. Holder, 750 F.3d 84, 86 (1st Cir. 2014)); see 8 U.S.C. §§ 1101(a)(42), 1158(b)(1)(B)(i); see also Elias-Zacarias, 502 U.S. at 482-83. The petitioner "'can meet this burden through proof of past persecution, which creates a rebuttable presumption of a well-founded fear of future persecution' or by demonstrating 'a well-founded fear of persecution through an offer of specific proof that [her] fear is both subjectively genuine and objectively reasonable.'" Chen v. Lynch, 814 F.3d 40, 45 (1st Cir. 2016) (quoting Singh, 750 F.3d at 86). The petitioner must also demonstrate that one of the five protected grounds is at least "'one central reason' for the harm alleged." Barnica-Lopez v. Garland, 59 F.4th 520, 528 (1st Cir. 2023) (quoting Singh v. Mukasey, 543 F.3d 1, 5 (1st Cir. 2008)); see 8 U.S.C. § 1158(b)(1)(B)(i).

1.

The IJ and BIA each concluded that the petitioner's evidence of threats and extortion were insufficient to constitute

past persecution. We find this conclusion is supported by substantial evidence and affirm.

For harm to qualify as persecution, it "must add up to more than ordinary harassment, mistreatment, or suffering." Lopez de Hincapie, 494 F.3d at 217. "We have long held that 'credible, specific threats can amount to persecution if they are severe enough' -- particularly if they are death threats." Aguilar-Escoto v. Garland, 59 F.4th 510, 516 (1st Cir. 2023) (quoting Javed v. Holder, 715 F.3d 391, 395-96 (1st Cir. 2013)); see also Un v. Gonzales, 415 F.3d 205, 210 (1st Cir. 2005) ("[C]redible verbal death threats may fall within the meaning of 'persecution.'"). We have further recognized that "the addition of physical violence, although not required, makes a threat more likely to constitute" persecution, Javed, 715 F.3d at 396, though "hollow threats, . . . without more, certainly do not compel a finding of past persecution." Moreno v. Holder, 749 F.3d 40, 44 (1st Cir. 2014) (omission in original) (emphasis added) (quoting Ang v. Gonzales, 430 F.3d 50, 56 (1st Cir. 2005)).

Here, the IJ concluded that the petitioner did not meet her burden of demonstrating that the threats she received constituted past persecution. Specifically, the IJ stated that the threats needed to be "more specific" than those shown by the petitioner and that the petitioner did not "provide enough evidence about specific threats." In so concluding, the IJ cited to our

decision in Javed where we distinguished between, on the one hand, "a single, vague threat or even a number of non-specific threats" and, on the other, "credible, specific threats," where the latter are more likely to constitute persecution. 715 F.3d at 395. Substantial evidence supports the IJ's determination that the threats the petitioner received lacked sufficient specificity to rise to the level of persecution.

The petitioner was threatened over the course of a year while working at her sister's business by gang members who demanded extortion payments. The weekly payments began at $25 per week and increased to $75 per week, at which point the petitioner and her sister could no longer afford them despite the petitioner forfeiting her personal earnings and her sister buying produce on credit and using the stand's income to pay extortion money instead. Based on her experience living in El Salvador and her initial conversation with her extortioners, the petitioner believed that if she did not make these payments, she would be killed by the gang members.

Yet, the threats that the petitioner received were of a general nature. There were no displays of force or violence to accompany the threats, and the petitioner was never physically harmed by the gang during her time in El Salvador. Although she mentioned that the extortion continued after she left, she did not provide evidence that anyone had tried to threaten or harm her

- 14 -

sister after the petitioner left El Salvador. The petitioner does not know whether the gang members have asked about her or attempted to look for her after the petitioner left El Salvador. She believed that other relatives had been killed by gangs in El Salvador, but did not know why, and did not provide evidence that their deaths were related to the threats she received.

Viewing the evidence of the threats the petitioner received and the surrounding circumstances, we find that the IJ's conclusions that the threats were not sufficiently specific or credible to rise to the level of persecution to be supported by substantial evidence. Even taking the petitioner's claims as true, we cannot say that the record "compel[s] a reasonable factfinder to reach a contrary conclusion." Dorce, 50 F.4th at 212.

The petitioner also argued that the economic harm she suffered was sufficient to constitute past persecution. While, as the petitioner notes, extortion alone may constitute persecution, to reach this level the extortion must constitute "deliberate imposition of severe economic disadvantage or the deprivation of liberty, food, housing, employment, or other essentials of life." Kadri v. Mukasey, 543 F.3d 16, 22 (1st Cir. 2008) (quoting Matter of T-Z-, 24 I. & N. Dec. 163, 171 (BIA 2007)); see also Matter of T-Z-, 24 I. & N. Dec. at 173 ("[E]conomic difficulties must be above and beyond those generally shared by others in the country of origin."). For example, in Kadri, we held that the petitioner

"may [have] be[en] able to sustain a claim for economic persecution" under this standard because he was ostracized from the medical profession in Indonesia and unable to earn a living as a doctor due to his sexual orientation.  543 F.3d at 22.

Here, the petitioner has failed to provide evidence of such hardship.  In her testimony, she stated that making the extortion payments deprived her and her sister of some of the profits of the fruit and vegetable stand and that on occasion she paid from her personal earnings when profits were low.  She did not testify that making these extortion payments imposed such difficulty as to deprive her of her liberty, threaten her survival, or bar her from employment.

On these facts we cannot say the record compels a finding of past persecution.[7]

## 2.

The IJ and BIA next concluded that the petitioner, having failed to prove she experienced past persecution, also failed to demonstrate future persecution on the basis of a protected ground because neither of the particular social groups she claimed --

---

[7]    The petitioner argues that the IJ erred by not addressing whether the petitioner's proffered particular social groups were cognizable or whether the petitioner had established a nexus between these groups and the harm she had suffered after finding her experiences failed to constitute past persecution.  She asks that we remand her matter for re-adjudication on these questions.  Because we find that the agency did not err in its finding of no past persecution, this argument is irrelevant.

"family members of business owners perceived as wealthy" and "people who have fled the gangs instead of continuing to pay extortion" -- were legally cognizable.

"[A]n applicant for asylum or withholding of removal based on membership in a particular social group must establish that 'the group is (1) composed of members who share a common immutable characteristic, (2) defined with particularity, and (3) socially distinct within the society in question.'" Hernandez-Martinez v. Garland, 59 F.4th 33, 39 (1st Cir. 2023) (quoting Matter of M-E-V-G-, 26 I. & N. Dec. 227, 237 (BIA 2014)). "Our circuit has . . . 'accepted'" this three-part test. Id. (quoting Mayorga-Vidal v. Holder, 675 F.3d 9, 14 (1st Cir. 2012)). "We must defer to the BIA's interpretation of the term particular social group as long as it is reasonable . . . [i.e.,] based on a permissible construction of the statute." Id. at 38 (internal quotation marks omitted).

### a.

First, the IJ and BIA concluded that "family members of business owners perceived as wealthy" was not cognizable as a particular social group because it failed to meet the requirement of immutability. "Immutability" with regard to a particular social group means that all members "share a common, immutable characteristic." Scatambuli v. Holder, 558 F.3d 53, 59 (1st Cir. 2009) (quoting In Re C-A-, 23 I. & N. Dec. 951, 951 (BIA 2006)).

- 17 -

This characteristic "must be one that members of the group either cannot change, or should not be required to change, because it is fundamental to their individual identities or consciences." In Re C-A-, 23 I. & N. Dec. at 951.

Here, the petitioner had not been in contact with her sister for more than a year before her merits hearing. The IJ was "unable to find that [the petitioner] . . . ha[d] a well-founded fear of future persecution as a family member of a business owner perceived as wealthy" because the petitioner did not know whether her sister Delmy was even still a business owner in El Salvador. The BIA also concluded "there [wa]s no indication the claimed group, or the business they once shared, continued to exist at the time of the merits hearing." It thus held that the petitioner's "past membership [in] this group would not likely be immutable nor would she have a well[-]founded fear of persecution related to this group upon return."

The petitioner argues that there is also "no definitive indication that [her sister] is no longer a business owner," but in an asylum proceeding the petitioner bears the burden of proving a nexus between her harm and a legally cognizable particular social group. See Paiz-Morales, 795 F.3d at 243-45; Hernandez-Martinez, 59 F.4th at 39-40.

The thrust of the petitioner's attack on the decision below is that she has met that burden and that the agency erred in

- 18 -

concluding otherwise insofar as it concluded that the claimed group is not defined by an immutable characteristic. The petitioner contends in support of her position that "a shared past experience" may be an immutable characteristic, Matter of Acosta, 19 I. & N. Dec. 211, 233 (BIA 1985), and that she and other family members share the past experience of having been related to a business owner. The petitioner further contends that regardless of whether her sister is still a business owner, it is very likely that the petitioner's persecutors will continue to impute her membership in this particular social group, even if the perception does not reflect reality.

But, as the BIA correctly noted, "[a] particular social group must not be amorphous, overbroad, diffuse, or subjective, and not every 'immutable characteristic' is sufficiently precise to define a particular social group." Thus, even if we were to assume that the claimed trait of a familial relation to a business owner is immutable, a proposed social group such as the one petitioner proposes -- that encompasses all family members of all business owners, past or present, who were perceived as wealthy at one point in time -- fails to meet this standard because it represents a "large, diffuse portion of society with characteristics simply too amorphous to readily distinguish the boundaries of membership." Mayorga-Vidal, 675 F.3d at 15 (citing Matter of S-E-G-, 24 I. & N. Dec. 579, 585 (BIA 2008)). Thus, the

petitioner's arguments with respect to this purported social group fail.

b.

Second, the IJ concluded that the petitioner's other alleged group, "people who have fled the gangs instead of continuing to pay extortion," was not cognizable because the petitioner had failed to submit sufficient evidence showing it "is a discr[ete] group perceived by Salvadoran society as a group." The BIA alternatively held that this group fails to meet the criteria for a particular social group because "it is based purely on fear of crime and economic extortion," and "[e]xposure to general conditions of crime and violence does not constitute persecution (past or future) for asylum purposes."

Although the petitioner challenges the BIA's rejection of this group on the ground that it is not circular because it is based on a shared immutable characteristic of a past experience, the BIA also separately adopted the IJ's reasoning for denying her claim of future persecution. And, in so ruling, the IJ gave as an independent reason for concluding that this asserted group is not cognizable that it lacks social distinctiveness. Thus, to succeed in showing the group is cognizable, the petitioner must show not only that the BIA's immutability analysis is mistaken but also that the IJ erred in finding that the group lacks social distinctiveness, as either ground for deeming the claimed group

- 20 -

not to be cognizable suffices to preclude the group from being so deemed. And while the petitioner contends that the IJ did err in so finding, we disagree.

The petitioner argues that the IJ erred because reports on country conditions in El Salvador showing that persons who refuse to pay extortion are at an "increased risk of violent retribution" provide evidence that "Salvadoran society perceives members of this proposed group as a distinct group."[8] She notes also that the Salvadoran Legislative Assembly revised a counter-terrorism criminal statute to impose criminal penalties on individuals who "solicit[], demand[], offer[], promote[], formulate[], negotiate[], convene[], or enter[] into a non-persecution agreement" with gangs, which she claims includes the kind of extortion agreement to which she was subjected, and argues the imposition of laws meant to protect against extortion means "people who have fled the gangs instead of continuing to pay extortion" are viewed as a discrete group within El Salvador.

The petitioner's argument fails because this evidence, which demonstrates that gang members who use extortion tactics are

_____

[8] The petitioner specifically cited a report from Human Rights Watch on El Salvador in 2019 which states "Gangs kill, disappear, rape, or displace, those who resist. These conditions have resulted in internal and cross-border displacement." She also stated, "studies estimate that nearly 300,000 Salvadorans were displaced in 2017 as a result of gang threats, violence, and extortion."

- 21 -

a recognized threat in El Salvador and that individuals who resist them face greater risk, focuses on her visibility to her alleged persecutors, rather than the visibility of her alleged particular social group to society. For the social distinction requirement, "[t]he relevant inquiry is whether the social group is visible in the society, not whether the alien herself is visible to the alleged persecutors." Mendez-Barrera v. Holder, 602 F.3d 21, 27 (1st Cir. 2010). Further, we have repeatedly held that alleged particular social groups based on resistance to gang pressure and extortion attempts do not meet the social distinctiveness requirement. See, e.g., Perez-Trujillo v. Garland, 3 F.4th 10, 18 (1st Cir. 2021) (finding "young, male, Salvadoran students who are forcibly recruited into gangs, refuse gang orders, and desert the gang" lacked social distinction); Mendez-Barrera, 602 F.3d at 27 (finding the group "young women recruited by gang members who resist such recruitment" is not socially visible nor generally recognized in the community (El Salvador) as a cohesive group).

Because the BIA made no error of law in interpreting the statute and the IJ's factual findings related to the application of these factors are supported by substantial evidence, we deny the petition for review.

**B.**

The petitioner also asserted a claim for withholding of removal under 8 U.S.C. § 1231(b)(3). "To petition successfully

for withholding of removal, an alien must show that, if returned to h[er] homeland, [s]he would more likely than not be subjected to persecution on account of a statutorily protected ground." Amouri v. Holder, 572 F.3d 29, 35 (1st Cir. 2009). Although based upon the same requirements, "withholding of removal 'imposes a more stringent burden of proof on an alien than does a counterpart claim for asylum.'" Rivera-Coca v. Lynch, 844 F.3d 374, 378 (1st Cir. 2016) (quoting Morgan v. Holder, 634 F.3d 53, 60 (1st Cir. 2011)). Because the BIA and IJ did not err when they concluded that the petitioner had not suffered past persecution and that neither of her alleged groups were cognizable for purposes of asylum, it follows that they did not err when they concluded that the petitioner did not meet her heavier burden for withholding of removal. See, e.g., Hernandez-Martinez, 59 F.4th at 40 (applying this logic).

## C.

Although the petitioner originally entered a claim for relief under the CAT before the IJ, who denied it, she did not meaningfully challenge the IJ's denial on appeal before the BIA. The BIA still affirmed the IJ's denial because the petitioner "did not establish that it is more likely than not that she would be subjected to torture in El Salvador by or with the acquiescence, (including willful blindness) of a public official or other person acting in an official capacity." By failing to raise any issue

with that ruling on appeal before this court, the petitioner has waived this claim.  We deny any portion of the petition seeking review of that part of the IJ and BIA decisions.

**IV.**

For the foregoing reasons, the petition for review of the decision of the BIA is **<u>denied</u>**.