# United States Court of Appeals
## For the First Circuit

No. 23-1726

JULIO ALVARADO-REYES; GLENDA GARMENDIA-ARDONA; J.A.G.,

Petitioners,

v.

MERRICK B. GARLAND, Attorney General,

Respondent.

PETITION FOR REVIEW OF AN ORDER OF
THE BOARD OF IMMIGRATION APPEALS

Before

Kayatta, Thompson, and Montecalvo,
<u>Circuit Judges</u>.

Kristian R. Meyer, with whom Kevin P. MacMurray and MacMurray & Associates were on brief, for petitioners.
Jesse D. Lorenz, Trial Attorney, Office of Immigration Litigation, Civil Division, United States Department of Justice, with whom Brian M. Boynton, Principal Deputy Assistant Attorney General, and Holly M. Smith, Assistant Director, were on brief, for respondent.

October 7, 2024

**THOMPSON, <u>Circuit Judge</u>.**  We recognized many years ago the unfortunate reality that "[g]ang violence apparently is endemic in El Salvador."  <u>Flores-Coreas</u> v. <u>Mukasey</u>, 261 F. App'x 287, 291 (1st Cir. 2008) (per curiam).  Today's immigration appeal suggests that that reality may not have changed much since then.  After being threatened by the notorious MS-13 gang, Salvadoran nationals Julio Alvarado-Reyes ("Alvarado-Reyes"), his wife Glenda Garmendia-Ardona ("Garmendia-Ardona"), and their minor son J.A.G. (collectively, "Petitioners") fled to the United States to seek safety.[1]  However, an Immigration Judge ("IJ") denied their applications for immigration relief.  The Board of Immigration Appeals ("BIA" and, collectively with the IJ, "the agency") affirmed that denial on appeal.  A petition for review with this court followed, asking us to reverse the agency's denial.  For reasons we'll get to shortly, though, we must deny the petition.

## HOW IT ALL STARTED

To kick things off, we lay out how it all started (i.e., the odyssey that brought Petitioners to the United States and how their case made its way to us).  In doing so, we pull the facts and procedural history from the administrative record.  <u>Dor</u> v. <u>Garland</u>, 46 F.4th 38, 42 (1st Cir. 2022).

---

[1]  We note that the record inconsistently hyphenates Alvarado-Reyes' and Garmendia-Ardona's surnames.  As the cover pages to both parties' briefing include the hyphenated spellings, those are what we use throughout this opinion.

*Life in El Salvador and Journey to the United States*

At about fourteen years old, Alvarado-Reyes moved into his grandparents' home in El Salvador to care for them because they had serious health issues. Alvarado-Reyes' now-wife, Garmendia-Ardona, moved in a few years later and also began caring for his grandparents, while he supported the family through agricultural work. These two eventually moved to a home nearby, had J.A.G., and got married. At some point, Alvarado-Reyes' uncle bought him a truck so that Alvarado-Reyes could take his grandparents (the uncle's parents) to their medical appointments. The purchase of this truck, it turns out, set off a chain of events which led to Petitioners' departure from El Salvador.

Towards the end of 2020, Alvarado-Reyes' grandmother died and, about a month later, he "began to have problems with the gangs." "The first incident" occurred when he was driving the truck and was stopped by MS-13 gang members, who asked him "to do a little trip for them." Confused by what "little trip" meant, he told them that he couldn't because the truck didn't belong to him, to which the gang members responded "that [he] would regret not helping them, that they knew where [his] family lived, that [his] family would pay, that [his] son would pay, that they would rape [his] wife and that they would kill [him]." Over the next few months and continuing through Petitioners' departure from El Salvador, Alvarado-Reyes was stopped (while driving) approximately

- 3 -

five more times and told the same things. He also received threatening phone calls from gang members, and these two types of threats (the calls and the stops on the street) together would "happen once or twice a week." Anonymous notes would also be left at Petitioners' home, "asking [Alvarado-Reyes] to give [the MS-13 gang members] rides."

Garmendia-Ardona, on the other hand, was never approached in person. That said, she did have some relevant interactions with MS-13 because gang members frequently called Petitioners' home and she "picked up the phone on [three] occasions." During these calls, the gang members asked for Alvarado-Reyes and "said they were asking him for favors and he was not cooperating." When Garmendia-Ardona responded that Alvarado-Reyes was not home, they threatened that "if [Alvarado-Reyes] kept refusing they would come to the house and kidnap [J.A.G.]." They also told her that she "was pretty and that '[she] was going to be one of their women.'" At the end of the calls, the gang members told her not to go to the police "because it will be worse for [her]." In light of these threats, Garmendia-Ardona did not feel safe and "would only leave [her] home to go to [her] mother's house."

Petitioners never went to the Salvadoran police because they were "afraid that the gangs would find out and kill [them]" since they "ha[d] heard and read stories of people reporting the

gangs to the police and then being killed by the gangs as revenge." They eventually fled to the United States in August 2021 because the threats from MS-13 "intensified." A few months after their arrival, on November 1, 2021, the Department of Homeland Security initiated removal proceedings against them.

*Removal Proceedings*

Exactly thirteen months later, on December 1, 2022, Petitioners appeared before the IJ for their merits hearing. To avoid removal back to El Salvador, Alvarado-Reyes applied for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT"). Garmendia-Ardona and J.A.G. did not file any applications themselves; rather, they simply sought asylum as derivatives of Alvarado-Reyes' asylum application.[2] In support of their claims, they offered the following evidence: in-court testimony and sworn, written affidavits from Alvarado-Reyes and Garmendia-Ardona, letters of support from family members and former neighbors in El Salvador, many country conditions reports, and a legal brief.

---

[2] Immigration law expressly allows for certain relatives of asylees to be granted asylum as "derivatives." Cabrera v. Garland, 100 F.4th 312, 315 n.1 (1st Cir. 2024) (citing 8 U.S.C. § 1158(b)(3)(A)). It doesn't, however, provide for derivative withholding of removal or CAT protection, id. (citing 8 C.F.R. § 1208.16(b), (c)), so by failing to submit any applications in their own names, Garmendia-Ardona and J.A.G. weren't considered for those forms of relief.

- 5 -

Once Alvarado-Reyes and Garmendia-Ardona -- the sole witnesses -- were done testifying, the IJ rendered an oral decision denying all forms of relief and ordering Petitioners' removal to El Salvador. As an initial matter, the IJ found both Alvarado-Reyes and Garmendia-Ardona credible. Turning next to the merits of the asylum claim,[3] he determined that the harm Alvarado-Reyes endured in El Salvador wasn't sufficiently severe to constitute "persecution."

The IJ then turned his attention to the three protected characteristics Alvarado-Reyes proffered -- namely, his membership in the following three PSGs: "Reyes family," "Salvadoran men," and "Salvadoran men who resist gang recruitment."[4] While the IJ

---

[3] We'll get more into this in a bit but, for now, just keep in mind that to be asylum-eligible, a noncitizen must demonstrate that they satisfy immigration law's definition of a "refugee." That definition in turn requires a showing that the noncitizen can't or won't return to their home country or country of last habitual residence "because of [past] persecution or a well-founded fear of [future] persecution on account of" at least one of five statutorily protected characteristics, which include "race, religion, nationality, membership in a particular social group [("PSG")], or political opinion." 8 U.S.C. §§ 1101(a)(42)(A), 1158(b)(1)(B)(i).

[4] We interrupt our summary of the IJ's decision for two important clarifications on the protected-characteristics front.

First, in Petitioners' briefing before the IJ, Alvarado-Reyes also proffered an anti-gang political opinion as another protected characteristic. At the merits hearing, though, it appears he didn't follow through with this theory of his case and the IJ didn't address it. Petitioners also made no political-opinion-based argument to the BIA or to us on appeal.

deemed Alvarado-Reyes' first two PSGs legally cognizable, he took exception to Alvarado-Reyes' third PSG. According to the IJ, "Salvadoran men who resist gang recruitment" was not sufficiently particular or socially distinct -- two indispensable requirements for a PSG to be cognizable.

Having thrown Alvarado-Reyes' third PSG in the bin, the IJ then considered whether the harm he suffered or feared suffering in El Salvador was or would be "on account of" his membership in the PSGs of "Reyes family" or "Salvadoran men." In the IJ's mind, Alvarado-Reyes was not targeted either for his family or gender; instead, MS-13 simply "wanted to use his truck to transport them." And without that causal connection between the harm and any protected characteristic, the IJ determined that Alvarado-Reyes

---

Second, Alvarado-Reyes also proffered three additional PSGs: "Salvadoran women," "Salvadoran female," and "Salvadoran women viewed as property by virtue of their status in society." Because Garmendia-Ardona did not file any application for relief in her own name and was only seeking derivative asylum, the IJ explained that "she was not required to establish that she was a victim of past persecution or [had] a well-founded fear of future persecution." In this way, then, the IJ concluded that these women-based PSGs were not relevant to Alvarado-Reyes' applications for immigration relief because he is a man. Petitioners did not challenge this conclusion in their briefing to the BIA or to us.

This is all to say, to the extent Petitioners hoped to move forward with any of these theories now, we deem them unexhausted and waived. See Odei v. Garland, 71 F.4th 75, 78 n.1 (1st Cir. 2023) (exhaustion); Martínez-Pérez v. Garland, 897 F.3d 33, 40 n.5 (1st Cir. 2018) (waiver).

had not suffered past persecution nor did he have a well-founded fear of future persecution. The IJ, therefore, denied asylum.

As withholding of removal shares many of asylum's requirements but has a higher burden of proof, the IJ determined that Alvarado-Reyes necessarily did not shoulder his burden as to that form of relief either. CAT protection was also denied because, to the IJ, there was insufficient evidence in the record that it was more likely than not that Alvarado-Reyes would be tortured in El Salvador on behalf of or with the acquiescence of or willful blindness of a Salvadoran government official.

Petitioners, thereafter, appealed to the BIA, but that appeal didn't do much for their plight. On August 1, 2023, pursuant to 8 C.F.R. § 1003.1(e)(4), the BIA dismissed their appeal with a proverbial thumbs-up to the IJ's decision, affirming the denial without opinion and rendering the IJ's decision the final agency decision on the books.

A timely petition for review with this court followed.

## HOW WE RESOLVE TODAY'S CASE

It's now time for our explanation as to how we resolve Petitioners' case. On appeal, they ask us to reverse the agency's denial of asylum, withholding of removal, and CAT protection. As the BIA affirmed without opinion, we focus our review on just the IJ's decision and consider the IJ's findings and conclusions to be those of the BIA as well. See Keo v. Ashcroft, 341 F.3d 57, 60

(1st Cir. 2003). In undertaking our review, "[w]e review the agency's legal conclusions de novo." Espinoza-Ochoa v. Garland, 89 F.4th 222, 230 (1st Cir. 2023). Meanwhile, factual findings are scrutinized using the substantial-evidence lens, meaning that in order for us "[t]o reverse . . . 'the evidence must not only support the contrary finding, but compel it.'" Caz v. Garland, 84 F.4th 22, 28 (1st Cir. 2023) (quoting Mahmoud v. Barr, 981 F.3d 122, 126 (1st Cir. 2020)).

But before getting into the weeds of whether the agency properly denied immigration relief, we take a brief detour to discuss an important preliminary issue.

*Hearing Transcript*

We are dismayed to note -- but feel compelled to mention -- that the transcript of Petitioners' merits hearing before the IJ is riddled with so many "indiscernible" notations so as to render the transcript effectively meaningless and useless to our review of their petition for review. Unfortunately for both noncitizens and our broader immigration system, "the problem of incomplete transcripts in immigration cases" is a recurring one. See Oroh v. Holder, 561 F.3d 62, 65 (1st Cir. 2009) (listing First Circuit cases dealing with similar issues). We have repeatedly recognized that due process requires that noncitizens have access to a reasonably accurate and complete transcript (or, at the bare minimum, an adequate substitute). See, e.g., Jani v. Garland, 110

- 9 -

F.4th 30, 39 (1st Cir. 2024); Oroh, 561 F.3d at 65; Kheireddine v. Gonzales, 427 F.3d 80, 84 (1st Cir. 2005).  Be that as it may, because Petitioners did not present this as an appellate issue, we leave this topic with our concerns noted and move on to the arguments before us.

*Asylum*

Petitioners first challenge the IJ's denial of asylum, and their challenge has three parts to it.  Specifically, they argue the following:  (1) the harm Alvarado-Reyes suffered and fears suffering in El Salvador amounted and will amount to "persecution";[5] (2) the "Salvadoran men who resist gang recruitment" PSG is a legally valid PSG; and (3) the harm he suffered and fears suffering in El Salvador was and will be "on account of" his PSG memberships.  To resolve today's petition, though, we need only address the second and third of these arguments.  Here's why.

As we alluded to before, an asylum applicant must meet the definition of a "refugee," which requires a showing of past or anticipated "persecution" on account of at least one statutorily protected ground.  8 U.S.C. §§ 1101(a)(42)(A), 1158(b)(1)(B)(i).

_____

[5] Petitioners suggest in their briefing that the IJ didn't actually "issue a formal holding on whether the past harm faced by [Alvarado-Reyes] . . . amounted to persecution."  Not so.  The IJ explicitly "f[ound] that the harm [Alvarado-Reyes] suffered in El Salvador did not rise to the requisite level to constitute past persecution."

- 10 -

As used here, "persecution" means harm that surpasses a certain degree of severity, harm that is causally connected (or has a "nexus" to) a cognizable statutorily protected characteristic, and harm that results from governmental action or inaction. Martínez-Pérez, 897 F.3d at 39. If a noncitizen fails to make a sufficient showing as to any one of these elements, their asylum claim fails. Aguilar-De Guillen v. Sessions, 902 F.3d 28, 33 (1st Cir. 2018). Applying this rubric here, then, and even taking Petitioners at their word on their first argument (that Alvarado-Reyes suffered or fears suffering harm that is sufficiently severe so as to constitute persecution), Petitioners nonetheless cannot prevail because "Salvadoran men who resist gang recruitment" is not, on this record, a legally cognizable PSG, and the remainder of their asylum claim unravels because they have not made a sufficient nexus showing. We take these in turn.

## PSG Cognizability

We start with first principles. "To prove persecution on account of membership in a [PSG], a[] [noncitizen] must show at a bare minimum that [he] is a member of a legally cognizable social group." Mendez-Barrera v. Holder, 602 F.3d 21, 25 (1st Cir. 2010). "For a PSG to be legally cognizable, an asylum applicant must make a three-part showing: the proposed PSG must (1) bear 'a common immutable characteristic,' (2) be 'defined with particularity,' and (3) be considered 'socially distinct within the society in

- 11 -

question.'" Cabrera v. Garland, 100 F.4th 312, 321 (1st Cir. 2024) (quoting Hernandez-Martinez v. Garland, 59 F.4th 33, 39 (1st Cir. 2023)). Teasing that out, we have explained that "a characteristic is considered immutable when 'members of the group either cannot change [it], or should not be required to change [it], because it is fundamental to their individual identities or consciences.'" Id. (quoting Montoya-Lopez v. Garland, 80 F.4th 71, 82 (1st Cir. 2023)). And "[a] group is considered particularly defined where it is 'discrete and ha[s] definable boundaries -- it must not be amorphous, overbroad, diffuse or subjective.'" Id. (quoting Paiz-Morales v. Lynch, 795 F.3d 238, 244 (1st Cir. 2015)); see also Matter of M-E-V-G-, 26 I. & N. Dec. 227, 238-39 (B.I.A. 2014) (reasoning that "[t]he 'particularity' requirement relates to . . . the need to put 'outer limits' on the definition of a 'particular social group'"). Finally, a group "is considered socially distinct where its members 'are set apart, or distinct, from other persons within the society in some significant way.'" Id. (quoting Rivas-Durán v. Barr, 927 F.3d 26, 31 (1st Cir. 2019)).

Here, we zero in on the particularity requirement and conclude that, because the proposed "Salvadoran men who resist gang recruitment" PSG is not sufficiently "particularly defined" on this record, Petitioners cannot make the necessary three-part cognizability showing for that proposed PSG. See, e.g., Zhakira v. Barr, 977 F.3d 60, 68 (1st Cir. 2020) (concluding that a

- 12 -

petitioner's asylum claim failed because the proposed PSG did not satisfy one of the three PSG requirements); Paiz-Morales, 795 F.3d at 244 (taking a similar approach and passing over immutability and social distinction "because even if the petitioner could show that he shared an immutable characteristic with a socially distinct group, he failed to define the purported group with the requisite particularity").

Petitioners say that the "Salvadoran men who resist gang recruitment" PSG may be large, but it has "clear benchmarks for determining membership":

> Members of this group must be men who have been targeted by members of a gang in order to join them in their gang related activities and have resisted the recruitment attempts. While resistance may take different forms, it is readily apparent within the context of Salvadoran society what actions constitute resistance to the gangs. As such, this group's definition is sufficiently particular.

This argument does not actually explain to us what "resist[ing] gang recruitment" means or how it is defined. And we've been clear that a petitioner must properly explain the outer limits of a proposed PSG that is "open to varying, subjective interpretations." See, e.g., Zhakira, 977 F.3d at 68 (rejecting as "too amorphous and overbroad" a proposed PSG of "westernized/Americanized Christians supporting the international campaign against Al-Shabab" where a petitioner did "not explain what attributes make an individual 'westernized' or

- 13 -

'Americanized,'" noting that "[t]he 'westernized/Americanized' characteristic" was "open to varying, subjective interpretations"). Petitioners conclusorily urge without elaboration that "resistance may take different forms, [but] it is readily apparent within the context of Salvadoran society what actions constitute resistance to the gangs." But this does not an outer limit create; instead,

> it is virtually impossible to identify who is or is not a member [of this group]. There are, for example, questions about . . . the type of conduct that may be considered "recruit[ment]," and the degree to which a person must display "resist[ance]." These are ambiguous group characteristics, largely subjective, that fail to establish a sufficient level of particularity.

Mendez-Barrera, 602 F.3d at 27 (emphases added). Here, Petitioners have made no attempt to answer these questions or define the terms used in their largely subjective PSG. Accordingly, we conclude the IJ did not err in denying Petitioners' claim for asylum based on Alvarado-Reyes' membership in this "Salvadoran men who resist gang recruitment" group.

As mentioned several pages back, though, this wasn't the only PSG on the table. The IJ deemed legally cognizable Alvarado-Reyes' other two PSGs -- "Reyes family" and "Salvadoran men." So we proceed to our examination of the IJ's conclusion that any harm Alvarado-Reyes suffered or feared suffering in El Salvador was not or would not be "on account of" his membership in those PSGs.

- 14 -

Recall that, to the IJ's thinking, Alvarado-Reyes was not targeted for his family or gender, but rather it was because MS-13 just "wanted to use his truck to transport them." And remember, because of this, the IJ spotted no causal connection (nexus) between the harm and any protected characteristic and therefore determined that Alvarado-Reyes had not suffered past persecution nor did he have a well-founded fear of future persecution.

We begin our examination by breaking down what exactly a sufficient nexus showing looks like. Immigration law provides that the nexus requirement is satisfied where the asylum applicant offers sufficient evidence that a statutorily protected ground "was or will be at least one central reason" for their persecution. 8 U.S.C. § 1158(b)(1)(B)(i). Requiring that the statutorily protected ground only be "at least one central reason" for the persecution "clearly contemplates the possibility that multiple motivations can exist, and that the presence of a non-protected motivation does not render an applicant ineligible for refugee status." Aldana-Ramos v. Holder, 757 F.3d 9, 18-19 (1st Cir. 2014). However, if the statutorily protected ground is simply "incidental, tangential, superficial, or subordinate to another reason for [the] harm," the applicant cannot be considered a

- 15 -

refugee. Singh v. Mukasey, 543 F.3d 1, 5 (1st Cir. 2008) (quoting In re J-B-N- & S-M-, 24 I. & N. Dec. 208, 214 (B.I.A. 2007)).

With that, let's zoom in on Petitioners' arguments as they relate to nexus. Basically, they argue that the IJ didn't engage in the required mixed-motive analysis and that the record compelled the conclusion that Alvarado-Reyes' membership in the PSGs of "Reyes family" and "Salvadoran men" was or will be at least one central reason for his persecution in El Salvador. Neither argument stands up.

Consider first the allegation that the IJ didn't engage in the proper mixed-motive analysis -- an allegation we review de novo. Jimenez-Portillo v. Garland, 56 F.4th 162, 166 (1st Cir. 2022). But looking at the decision itself, we are persuaded that the IJ did, in fact, consider such a possibility. To explain, after reviewing the evidence and referencing portions of Alvarado-Reyes' and Garmendia-Ardona's testimony, the IJ reasoned that Alvarado-Reyes "was targeted simply because he owned a truck." The IJ then proceeded to consider whether Alvarado-Reyes' legally cognizable PSGs were another reason for his persecution and determined that they were not. If the IJ had, indeed, failed to consider the possibility of mixed motives, he would have stopped his analysis after determining that MS-13 targeted Alvarado-Reyes for his truck as there would have been no reason to consider any

- 16 -

other motivations. Accordingly, we are not persuaded by Petitioners' first claim of error.

That leaves us with just Petitioners' second claim of nexus-related error -- that is, the IJ erred in determining that Alvarado-Reyes' PSG memberships weren't and won't be "at least one central reason" for his persecution. The determination of whether a protected characteristic is one central reason for a noncitizen's persecution is usually a question of fact, and is a question of fact in this case, so we review this argument for substantial evidence. Id. at 167. To win on substantial evidence review, Petitioners must demonstrate that the IJ's nexus determination was not "supported by reasonable, substantial, and probative evidence on the record considered as a whole." Loja-Tene v. Barr, 975 F.3d 58, 62 (1st Cir. 2020) (quoting Immigr. & Naturalization Serv. v. Elias-Zacarias, 502 U.S. 478, 481 (1992)). In other words, the evidence must point undoubtedly in favor of and compel Petitioners' preferred reading of the record, such that no adjudicator could have reasonably reached the IJ's conclusion. See Jimenez-Portillo, 56 F.4th at 167. They haven't cleared that daunting hurdle.

Petitioners' first PSG was "Reyes family," but there's simply nothing in the record from which we could even infer Alvarado-Reyes was targeted because he was part of the Reyes family. There's nothing to suggest that, had Alvarado-Reyes

- 17 -

belonged to another family but still owned a truck, the MS-13 gang members would not have targeted him. While Garmendia-Ardona and J.A.G. arguably might have been targeted due to their familial connection to Alvarado-Reyes, that is not the relevant inquiry. Rather, the relevant inquiry is why Alvarado-Reyes -- as the asylum applicant -- was targeted, and Petitioners have pointed to no record evidence compelling the conclusion that he was targeted due to his membership in the "Reyes family."

Petitioners fare no better with their remaining "Salvadoran men" PSG. As above, there's nothing in the record to suggest that, had Alvarado-Reyes been a woman (i.e., a member of "Salvadoran women"), the MS-13 gang members would not have targeted him. To the contrary, the extensive country conditions evidence in the record supportably shows that gang members target both men and women alike. In this way, then, the record does not compel the conclusion that Alvarado-Reyes' gender was "at least one central reason" for his persecution.

As such, we conclude that the IJ's no-nexus determinations were supported by substantial evidence and affirm the denial of asylum.

*Withholding of Removal and CAT Protection*

Having affirmed the denial of asylum, we turn to withholding of removal and CAT protection. Turning first to withholding of removal, that form of relief -- similar to asylum

- 18 -

-- also requires PSG and nexus showings but has a higher burden of proof. Cabrera, 100 F.4th at 324; Lopez de Hincapie v. Gonzales, 494 F.3d 213, 220 (1st Cir. 2007). The inevitable "corollary" to this is that, where Alvarado-Reyes failed to carry his asylum burden, he also failed to carry his withholding burden. Caz, 84 F.4th at 30.

Rounding things out with CAT protection, the only mention of such relief in Petitioners' opening brief is two sentences in their introductory summary section, stating that Alvarado-Reyes "is eligible for . . . protection under the . . . CAT" and "ask[ing] this court to reverse and remand the BIA's decision affirming the [IJ's] order denying [Alvarado-Reyes'] application for . . . protection under the CAT." Other than those two introductory sentences, nothing in their briefing (or at oral argument, for that matter) addresses the merits of Alvarado-Reyes' CAT claim, which amounts to waiver, plain and simple. See Sok v. Mukasey, 526 F.3d 48, 52 (1st Cir. 2008) (deeming CAT claim waived where "no argument [was made] with respect to the . . . claim beyond an introductory assertion that '[t]he record establishes the merits of [petitioner's] claim[] for . . . protection pursuant to the [CAT]'" (second and fifth brackets in original)).

*Affirmance Without Opinion*

Before we part, we have one final argument to address. Petitioners argue that the BIA, in affirming the IJ's decision

- 19 -

without opinion, violated its obligation to "give careful, individualized, rational explanations for its decisions." Haoud v. Ashcroft, 350 F.3d 201, 207 (1st Cir. 2003) (quoting Mousa v. Immigr. & Naturalization Serv., 223 F.3d 425, 430 (7th Cir. 2000)). We think this argument comes up dry.

To begin, "we have held time and time again that the" BIA's affirmance-without-opinion "procedure constitutes 'a valid exercise of the Attorney General's discretion to fashion its own rules of procedure.'" Larios v. Holder, 608 F.3d 105, 108 (1st Cir. 2010) (quoting Mekhoukh v. Ashcroft, 358 F.3d 118, 130 (1st Cir. 2004)). We've also recognized that, under certain circumstances, regulations actually require that the BIA summarily affirm the IJ's decision without opinion. See Cruz v. Garland, 106 F.4th 141, 145-46 (1st Cir. 2024).

Even taking Petitioners' argument head on, the BIA enjoys a presumption of regularity when it acts officially, see, e.g., Domingo-Mendez v. Garland, 47 F.4th 51, 56 (1st Cir. 2022); Enwonwu v. Gonzales, 232 F. App'x 11, 15 (1st Cir. 2007) (per curiam), so an affirmance without opinion does not necessarily mean the BIA failed to engage in a fulsome review of the record or offer a rational explanation for its conclusion. Indeed, as the old saying goes, evidence of absence is not absence of evidence and Petitioners point to nothing in the record that suggests anything might have been amiss here. And significantly, as our

analysis above shows, we spotted no reversible error in the IJ's decision so the BIA was not wrong to affirm.  See Cruz, 106 F.4th at 146 (rejecting challenge to BIA's affirmance-without-opinion procedure, in part, because "the record provides no basis for questioning the IJ's factual determination").  In sum, Petitioners' argument comes up short.

## HOW IT ENDS

We recognize -- as demonstrated by Petitioners' statements and the voluminous country conditions evidence in the record -- that rampant gang violence leaves Salvadorans in particularly dire straits with little to no recourse. Nevertheless, on this specific record, there is nothing we can do about it for Petitioners.  All in all, we must deny the petition.